**FIRST NATIONAL BANK OF MINOT, a Corporation, Plaintiff and Appellant,**

**v.**

**MacDONALD CONSTRUCTION COMPANY, a Corporation, and A & A Contractors, a Corporation, Defendants,**

**MacDonald Construction Company, a Corporation, Defendant and Respondent.**

**No. 8100.**

Supreme Court of North Dakota.

Oct. 21, 1965.

McGee, Van Sickle & Hankla, Minot, for appellant.

Palda, Palda, Peterson & Anderson, Minot, for respondent.

BURKE, Chief Justice.

In this case the First National Bank of Minot sought to recover from A & A Contractors, Inc., and the MacDonald Construction Company, a balance of $40,000.00 alleged to be due the Bank upon an indebtedness of A & A.

Judgment was entered by default in favor of the Bank against A & A. The issues arising upon the Bank's claim against MacDonald were tried to the court without a

jury. The trial court resolved these issues in favor of MacDonald and judgment was entered dismissing the Bank's claim against MacDonald. The Bank has appealed from the judgment and has demanded a trial de novo in this court.

The Bank founded its claim against MacDonald upon (1), An assignment by A & A to the Bank of all monies due or to become due A & A from MacDonald upon a construction contract between A & A and MacDonald. (2), A guaranty by MacDonald of Loans made by the Bank to A & A up to the amount of $50,000.00 but limited to the amount of MacDonald's indebtedness to A & A and (3), claimed representations on the part of MacDonald which it is urged create an estoppel to deny the claim.

MacDonald was the prime-contractor for the erection of certain housing units at the Minot Air Force Base. On July 31, 1958, A & A entered into a contract with MacDonald to make the heating and ventilating installations in these housing units for $420,000.00. A & A was a corporation engaged in the contracting business with its principal place of business located at Minot. From 1956 and thereafter it had done its principal banking business with the First National Bank of Minot. At sometime late in the fall of 1958, the Bank, agreed to finance A & A upon this building project by making advances based on completed work estimates. Thereafter on November 18, 1958, and on December 23, 1958, A & A executed assignments to the Bank of all monies due or to become due to it from MacDonald. The assignment of November 18, was general in character while that of December 22, was specifically limited to amounts to become due under the contract of July 31, 1958. Receipt of both of these assignments was acknowledged by MacDonald.

Paragraph III of the contract between MacDonald and A & A provided:

"III Method of Payment. Payments shall be made by the Contractor to the Sub-contractor monthly as the work progresses, as follows:

"On the day of each month designated by the Contractor, the Sub-contractor shall submit to the Contractor for inclusion in the Contractor's estimate to the Owner, an estimate of the work installed during the preceding month by the Sub-contractor. Upon approval and payment of the Contractor's estimate by the Owner, said Sub-contractor shall be paid 90% of the amount of its approved estimate. 10% of such estimate shall be retained by the Contractor until final completion of the project. Final payment shall be made when written acceptances and payment in full have been received from the Owner by the Contractor, provided satisfactory evidence has been furnished by Sub-contractor that all claims for labor and materials have been satisfied and paid in full."

Paragraph XIIIb of the contract provides in part:

"* * * If the Sub-contractor shall fail to pay and satisfy any such claim, demand, judgment or expense the Contractor may do so, with or without notice to the Sub-contractor, as it may elect, and charge any sum so paid to the Sub-contractor. * * *."

Paragraph VI of the contract provided:

"* * * Should the Sub-contractor fail to do so to the satisfaction of the Contractor, or should it become insolvent, or refuse to follow the plans and specifications or to perform the work in a good and workmanlike manner, or cause by any action the stoppage of the work of the other trades upon the structure, or fail to comply in any other respect with any of the articles of this agreement, then the Contractor may, after giving forty-eight (48) hours notice of such failure, neglect, default, interference or breach of contract, in writing, by mail directed to the Sub-

contractor at his last known residence or place of business, or delivered at such place, or to the foreman in charge of the work for the Sub-contractor, enter into and take possession of the said premises and work, materials, tools, applicances and equipment and workmen (The Sub-contractor agreeing that in this event it will turn over to the Contractor all necessary material contracts, bills of lading for material enroute and any other information that would tend to lessen the cost of completion), and may provide such other material, appliances and workmen as may be necessary to complete this work, and the expense of such notice and of the completion of such work shall be deducted from the amount due or to become due to the Sub-contractor * * *."

All payments made by MacDonald upon its subcontract with A & A were made to A & A and the Bank jointly. These payments totaled $300,325.53. The first payment was made February 4, 1959, and the last on January 11, 1960.

These payments were made upon estimates of percentage of work completed which were submitted from time to time by A & A. Each of the estimates bore an endorsement that it was approved by MacDonald's representative upon the construction job. In addition to submitting these estimates to MacDonald, A & A also furnished copies to the Bank and the Bank made loans to A & A up to 80% of the amounts shown to be due A & A from MacDonald upon such estimates. The contract called for the construction of 932 units at $450.00 apiece. The estimates contained a detailed statement of the percentage of completion of the units under construction and ended with a summary of the total work completed to the date of the estimate. In the last estimate submitted, dated November 30, 1959, this summary stated:

"Total work completed to date    $332,238.82
Less previous estimates           215,362.61
Net due this estimate             116,876.21"

Each of the other estimates contained an item designated as retainage in accordance with the contract between MacDonald and A & A which provided that MacDonald in making partial payments to A & A pursuant to estimates should retain 10% of the value of the completed work. Thus the summary of the estimate of September 10, 1959, showed the following:

"Total work completed to date    $294,300.00
Less previous estimate            148,700.00
Less retainage 10%                 29,300.00
                                 _____
Net due this estimate            $116,170.00"

If retainage had been deducted in the estimate of November 30, 1959, in accordance with the contract between MacDonald and A & A the net amount shown by this estimate would have been reduced from $116,876.21 to $83,642.22. Of this the Bank, was aware or should have been aware, both from the estimates previously submitted and from the contract between MacDonald and A & A, a copy of which was in the Bank's possession.

On December 1, 1959, A & A's indebtedness to the Bank was $82,000.00. An officer of the Bank testified that he undertook negotiations with A & A to get this amount reduced. MacDonald was drawn into these negotiations and as a result MacDonald sent the Bank a letter of guarantee by which it guaranteed A & A's indebtedness up to the amount of $50,000.00 but specifically provided, "Any payments made hereunder are to be made from funds due A & A Contractors from us, and not otherwise." Thereafter the Bank increased A & A's line of credit. On December 22, 1959, A & A owed the Bank $90,000.00 and on December 31, 1959, $95,000.00.

In the meantime, however, and as early as September, 1959, if not before, A & A was encountering difficulty in paying its material suppliers. An audit completed as of September 30, 1959, showed that A & A owed Lennox Industries, the principal supplier on its contract with MacDonald, $193,351.23. The audit also showed that

A & A's bank account was overdrawn in the net amount of $43,190.83. A copy of the audit was in the Bank's possession in November 1959. The estimates submitted were therefore accurate as to the contract value of the work completed but were not necessarily accurate as to the statement of the net amount due the subcontractor because of the prime-contractor's reservation of the right to pay unpaid amounts due suppliers of materials used in completing the subcontract and charge such payments against amounts due the subcontractor. According to both Mr. Henne, President of A & A and Mr. Johnson, Vice-President of the Bank, A & A's financial condition was revealed to the Bank and each time a remittance was received from MacDonald, payable to A & A and the Bank jointly, a conference was held as to distribution of the proceeds of the check. On December 10, 1959, the Bank was aware of two checks in the total sum of $75,000.00 drawn on it by A & A and payable to Lennox Industries, upon which payment had been refused because of insufficient funds. After November 30, 1959, Lennox Industries refused to make any further deliveries to A & A because of its failure to pay for the materials previously furnished.

After receipt of the last work estimate, dated November 30, 1959, the Bank, according to the testimony of one of its officers received payments from MacDonald as follows: Dec. 2, 1959, $2,044.11 and $771.40; Dec. 10, 1959, $5,805.08 and $453.60; Jan. 12, 1960, $14,956.75 and $2,652.30 and Jan. 11, 1960, by wire, $50,000.00 or a total of $76,683.24.

At what time MacDonald discovered that A & A was in financial difficulties and that the statements of net amounts due in the estimates of work completed did not reflect a true picture of the amount due because A & A was not able to pay its bills for materials, is not precisely disclosed by the record. It must have been shortly after January 26, 1960, because MacDonald stopped payment upon two checks issued to A & A and the Bank on that day.

On February 13, 1960, MacDonald served notice of the termination of its contract with A & A upon the ground of "non-payment of bills due upon your sub-contracts and insolvency." There is testimony in the record that the Bank was orally notified of the proposed termination of this contract at some time between February 1, 1960 and February 10, 1960. MacDonald thereupon, in accordance with its contract, took over the completion of the work A & A had contracted to do, it paid all of A & A's unpaid bills for materials and altogether in the completion of the contract it expended sums which together with the amounts previously paid to A & A, brought the total cost of the project to MacDonald to more than $560,000.00 or approximately $140,000.-00 more than the amount for which A & A had contracted to do the work. By the terms of the contract between MacDonald and A & A this excess cost was chargeable against any amounts due or to become due to A & A. There is therefore no question but, that at the time the Bank demanded payment from MacDonald, on May 26, 1960, MacDonald was not indebted to A & A in any amount, but on the other hand, A & A was indebted to MacDonald.

The Bank claims, however, that the "net due" as shown on each estimate of completed work, when approved by MacDonald's authorized agent, became a designated amount to which the Bank's assignment attached. That is to say that the amount due as shown by an approved estimate was not thereafter, as between the Bank and MacDonald, subject to any charges which were allowable under the construction contract, to MacDonald against A & A. It is the Bank's position, therefore, that the approved estimate of November 30, 1959, in the sum of $116,876.21 fixed MacDonald's liability under the assignment to the Bank at that amount.

In opposition MacDonald asserts that the Bank, as assignee could acquire no greater rights, than its assignor, A & A, had under the contract, and that any charges available to MacDonald under the contract against

A & A were also available to MacDonald as against the Bank.

In support of its position the Bank cites, North Pacific Bank v. Pierce County, 24 Wash.2d 843, 167 P.2d 454, 164 A.L.R. 602; General Excavator Co. v. Judkins, 128 Ohio St. 160, 190 N.E. 389; Carr & Howard Construction Co. v. Panhandle State Bank, Tex.Civ.App., 347 S.W.2d 793. In North Pacific Bank v. Pierce County, the building contract contained a provision that the owner might retain 15% of the contract price for the payment of labor and material which the contractor failed to pay, but contained no authorization to withhold any additional amounts for that purpose.

In General Excavator Co. v. Judkins, the question before the court related solely to the priority of assignments. Carr & Howard Construction Co. v. Panhandle State Bank related to an assignment by a subcontractor of a specific sum which assignment had been accepted by the contractor.

None of these decisions is applicable to the instant case. Here the contract between the subcontractor and the prime-contractor did provide that the prime-contractor, in addition to the percentage reserved, might retain out of any sums due or to become due the subcontractor an amount sufficient to complete the contract in the event of the subcontractor's default. Here too, the prime-contractor did not accept the assignment by the subcontractor but merely acknowledged receipt of it.

On several occasions this court has held that an assignee has no greater rights against a debtor than the assignor had. Emerson-Brantingham Co. v. Brennan, 35 N.D. 94, 159 N.W. 710; Clow v. Sweeney, 42 N.D. 194, 172 N.W. 66; Lower Yellowstone Irrigation District #2 v. Tollefson, 68 N.D. 39, 276 N.W. 254. In Pacific Coast Steel Co. v. Old Nat. Bank, 134 Wash. 457, 235 P. 947, the Supreme Court of Washington gave extended and scholarly consideration to the legal issues which may arise when a contractor assigns the amounts due or to become due to him under a building contract. That court summed up its conclusions as follows: (p. 951)

"The sum total of these decisions seems to be, that where a contract provides for a specific amount of the contract price to be retained by the municipality for the payment of labor and material, the balance of the estimates may be assigned by the contractor, and that the assignee is entitled to receive all the assigned amounts, if (1) there is no provision in the contract that the municipality may, in addition to the percentage reserved, retain out of the balance amounts sufficient to cover labor and material claims; (2) that even where such a provision for the retention of amounts in addition to the reserved percentage is contained in the contract, payments to the assignee by the municipality before any notice to it of any unpaid labor and material claims can be retained by the assignee; (3) that the same result follows even where the contract does not provide that the municipality may retain amounts in addition to the reserved percentage if the contract obliges the contractor to pay all material and labor claims; (4) that where the contract provides that the municipality has the right to retain amounts in addition to the reserved percentage for the purpose of paying labor and material claims, and assignment is made by the contractor, and the assignment is accepted in its entirety by the municipality, the assignment thereby becomes binding, and the municipality has no right thereafter to retain any amount above that specified in the retained percentage, and; (5) that where the contract provides that the municipality has the right to retain amounts in addition to the reserved percentage for the payment of labor and material claims, the municipality is not compelled to make any such additional retention, but

if it sees fit may pay the entire amount of the estimates, less the reserved percentage to the assignee; (6) that where the contract provides that the municipality has the right to retain amounts, in addition to the reserved percentage for the payment of labor and material claims, the municipality may accept such assignment pro tanto by paying estimates as they become due, and still retain the right to refuse payment of later estimates and hold such amounts for the payment of claims."

The rules set forth in the quoted passage appear to us to establish a reasonable and legally correct approach to the solution of the issues of law which may arise concerning the respective rights of assignor, assignee and debtor under an assignment of amounts to become due the assignor under a building contract and extended research on our part has disclosed no authority to the contrary. We, therefore adopt these rules in so far as they are applicable to the instant case as the law of this State.

Applying these rules to the facts of this case, it follows that the Bank's contention that the approved estimate of November 30, 1959, operated to set aside the amount of that estimate absolutely to the Bank cannot be sustained. As long as the amount of that estimate remained unpaid it was subject, under the contract, to any charges MacDonald might have against A & A for the completion of the work upon A & A's default, and in the absence of any acceptance of the assignment of a specific amount by MacDonald, the Bank's rights were subject to the provisions of the contract.

We are also of the opinion that neither the Bank's claim under MacDonald's guaranty of A & A's loan nor its claim of estoppel can be sustained. By the limitations expressly stated in the guaranty, MacDonald's liability thereunder cannot be extended beyond the amount of MacDonald's indebtedness to A & A. Since the evidence in the case conclusively establishes that MacDonald owed nothing to A & A, it had no liability under the guaranty.

The Bank's claim of estoppel is founded upon the contention that the approved estimate of November 30, 1959, constituted a representation by MacDonald that the amount stated in such estimate was due A & A; that MacDonald knew that the Bank was extending credit to A & A upon the basis of the estimates and is therefore estopped to urge that the full amounts of the approved estimate is not due. This claim wholly overlooks the fact that estimates made under the contract were subject to the other provisions of the contract and as long as the estimates remained unpaid MacDonald had the right to charge against the amount thereof the cost of completing the contract in the event of A & A's default. The Bank had a copy of the contract and notice of its provisions. MacDonald was not obliged to state that its approval of each estimate was a qualified approval because it was in fact such under the contract. It is probable too that if MacDonald had been aware of A & A's unpaid indebtedness to its suppliers in November 1959, as the Bank was, that no part of the estimate of November 30, would have been paid and the Bank's predicament would have been that much worse. In any event the Bank, because of its knowledge of A & A's plight, should have been aware that MacDonald's right under the contract, to make charges against the estimates was in imminent danger of being enforced. None of the incidents which ordinarily give rise to an estoppel are present here.

It follows that the judgment of the District Court dismissing this action as against MacDonald must be affirmed.

ERICKSTAD, STRUTZ and TEIGEN, JJ., concur.

KNUDSON, J., not being a member of the Court at the time of submission of this case, did not participate.