STATE, Respondent, v. SHEARS, Appellant. [No. State 109.]

STATE, Respondent, v. MADDEN, Appellant. [No. State 110.]

STATE, Respondent, v. FORD, Appellant. [No. State 112.]

*Nos. State 109, 110, 112. Argued January 2, 1975.—Decided May 6, 1975.*

(Also reported in 229 N. W. 2d 103.)

218

222

For the appellant Danny Shears (Case No. State 109) there were briefs by *Howard B. Eisenberg,* state public defender, and *Ronald L. Brandt,* assistant state public defender, and oral argument by *Mr. Brandt.*

For the appellant Marvin Louis Madden (Case No. State 110) there was a brief and oral argument by *Howard B. Eisenberg,* state public defender.

For the appellant Jesse James Ford III (Case No. State 112) there was a brief by *Beverly A. Temple* and oral argument by *Stephen M. Glynn,* both of Milwaukee, and a supplementary pro se brief by Mr. Ford.

For the respondent state of Wisconsin the cause was argued by *Thomas J. Balistreri,* assistant attorney general, with whom on the briefs were *Robert W. Warren,* attorney general (Case Nos. State 109 and 110), and *Victor A. Miller,* attorney general (Case No. State 112).

HANLEY, J. Numerous issues are presented on this appeal. The issues which are common to all three cases will be discussed first and then the issues personal to two or one defendant will be discussed. The issues presented upon this appeal are:

1. Were the defendants denied their constitutional right to a speedy trial?

2. Did the trial court err in granting the state's motion to consolidate these cases for trial and in denying the defendants' motions for severance?

3. Were the defendants denied their rights to an impartial jury because of limitations placed on the defendants' questioning on *voir dire?*

4. Were the defendants denied constitutional rights by the manner in which the charges were brought against them under sec. 939.05, Stats.?

5. Did the trial court err in not giving a jury instruction on the weight to be given the testimony of Lumumba Kenyatta, Alexis Tolson and George Bryant?

6. Did the trial court err in refusing to instruct the jury on the lesser-included offense of third-degree murder?

7. Was there sufficient evidence to sustain the jury verdict?

8. Should a new trial be granted in the interest of justice?

9. Was it an abuse of discretion for the trial court to impose a consecutive thirty-year sentence to two life terms on the defendants Shears and Madden?

10. Did the trial court err in refusing to dismiss the complaints against Shears and Ford?

11. Was there probable cause for the arrests of Ford and Madden?

12. Are the provisions of sec. 255.02, Stats., unconstitutional because such provisions deny a defendant an impartial jury by excluding certain classes of persons?

13. Was defendant Shears denied constitutional rights by virtue of the fact that he was denied a preliminary examination under sec. 970.02 (1) (c), Stats.?

14. Did the trial court err in permitting the state to introduce the transcripts of the testimony taken at the first preliminary into evidence at a second preliminary held after the death of Hanson?

15. Was Ford denied his right to the attorney of his choice?

16. Was Ford denied his right to the effective assistance of counsel?

17. Was Ford denied his constitutional right to remain silent by certain remarks made by the prosecutor during closing arguments?

Because the appeals from the judgments have been dismissed, only the denials of the postconviction motions are involved on this appeal. The standard of review in such cases was restated in *Jones v. State* (1974), 63 Wis. 2d 97, 99, 216 N. W. 2d 224:

". . . While it was pointed out in *State v. Simmons* (1973), 57 Wis. 2d 285, 289, 203 N. W. 2d 887, and *State v. Wollmer* (1970), 46 Wis. 2d 334, 335, 336, 174 N. W. 2d 491, that the test to be applied in reviewing a trial court's order denying a new trial is whether there has been an abuse of discretion, this test is not applicable where a question of law is presented, as the applicable test is whether the court was in error. *State v. Mabra* (1974), 61 Wis. 2d 613, 213 N. W. 2d 545."

*Speedy trial.*

All defendants argue that they were denied their rights to a speedy trial. Defendants Ford and Madden were arrested on January 13, 1972, and their initial appearances were on the following day. Defendant Shears was extradited from Illinois on August 1, 1972, and first appeared in court on August 2, 1972. The process of choosing a jury began on January 23, 1973, and on January 26, 1973, the first witness was called.

The right to a speedy trial is guaranteed an accused by the sixth amendment of the United States Constitution. It is a "fundamental right" and is imposed on the states by the due process clause of the fourteenth amendment. *Klopfer v. North Carolina* (1967), 386 U. S. 213, 87 Sup. Ct. 988, 18 L. Ed. 2d 1; and *State ex rel. Fredenberg v. Byrne* (1963), 20 Wis. 2d 504, 510, 123 N. W. 2d 305. Where the right to a speedy trial has been denied, the only possible remedy is dismissal. *Strunk v. United States* (1973), 412 U. S. 434, 440, 93 Sup. Ct. 2260, 37 L. Ed. 2d 56.

In determining whether there has been a denial of a speedy trial in a particular case, *Barker v. Wingo* (1972), 407 U. S. 514, 530, 92 Sup. Ct. 2182, 33 L. Ed. 2d 101,

requires a balancing test to be applied which weighs the conduct of both the prosecution and the defendant. The supreme court said:

"A balancing test necessarily compels courts to approach speedy trial cases on an *ad hoc* basis. We can do little more than identify some of the factors which courts should assess in determining whether a particular defendant has been deprived of his right. Though some might express them in different ways, we identify four such factors: Length of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant."

This court followed the *Barker* balancing test in *Day v. State* (1973), 61 Wis. 2d 236, 212 N. W. 2d 489.

The first factor, length of delay, was described in *Barker* as being to some extent a triggering measure because until the length of delay is such as to be presumptively prejudicial there is no necessity to consider the other three factors. The supreme court noted that the length of the delay which would require further inquiry is dependent upon the particular circumstances of the case involved. 407 U. S. at 530, 531. Even when there is a presumptively prejudicial delay, the length of delay is a factor to be considered.

The delays in the cases of Ford and Madden were a little over one year, while the delay in Shears' case was approximately six months. This court has not held that a one-year delay is presumptively prejudicial although it may be in some cases. In the recent case of *Hadley v. State* (1975), 66 Wis. 2d 350, 363, 225 N. W. 2d 461, this court held that a delay of almost eighteen months was "so excessive that it leads prima facie to the inquiry of whether there was a denial of speedy trial." In *Commodore v. State* (1967), 33 Wis. 2d 373, 147 N. W. 2d 283, the court held a delay of nine months not oppressive; delays of nine months in *Williams v. State* (1968), 40 Wis. 2d 154, 161 N. W. 2d 218, and

nineteen months in *Taylor v. State* (1972), 55 Wis. 2d 168, 197 N. W. 2d 805, were held to be not oppressive.

In *Day v. State, supra,* this court held that a delay of seven months was not so long as to individually establish a denial of the right to a speedy trial, but the balancing test was applied to determine that the defendant was not denied a speedy trial. In the instant case, we will balance the four factors listed in *Barker* to determine if in fact there was a denial of the right to a speedy trial.

The second factor, after the length of the delay, is the reason for the delay. The record does not indicate any specific reasons for the delay. As noted, Ford and Madden first appeared in court on January 14, 1972. A preliminary examination was begun on January 22d. This was adjourned after one witness was called and continued on January 28, 1972. The testimony at the preliminary hearing was concluded the following day. The court found probable cause and Madden and Ford were bound over on February 2, 1972.

Another complaint was filed on April 28, 1972, and Madden and Ford were brought into court for another initial appearance. This complaint charged these defendants with first-degree murder for the death of Lester Hanson. May 2, 1972, was set for the preliminary examination. On May 2, 1972, the preliminary was rescheduled. On May 12, 1972, another court appearance was held, at which time motions to dismiss were denied and the preliminary scheduled for May 18, 1972. The preliminary was continued and on May 22, 1972, probable cause was found.

Ford and Madden were arraigned before Judge JACK-MAN on the 1st day of June, 1972. On July 21 and 25, 1972, a codefendant, Eugene Sills, appeared before Judge BARDWELL with respect to a plea bargain. On August 2, 1972, defendant Shears appeared in Dane county court and was bound over without a preliminary examination

because he had been extradited from Illinois. Shears appeared in court and moved for a substitution of judges on August 23, 1972.

On September 5, 1972, the three and another codefendant, Joan Zilanis, appeared before the court for a motion by the state for consolidation. The motion was granted and the four defendants were arraigned on September 11, 1972.

Counsel for the defendants met for a conference in Judge BARDWELL'S chambers on November 16, 1972. At this time, Judge BARDWELL expressed his concern for getting the case tried. He mentioned he had set December 4, 1972, for trial. Ford's counsel stated that his pretrial motions had not been heard and that he had filed them but had not filled out the blanks as to a date for a hearing on the motion because he thought the court was going to hear all motions at once and it was going to set aside a date to hear them. The judge indicated December 4th was open to anybody who would want it. Counsel stated they were not demanding an immediate trial.

Hearings on the pretrial motions were held on December 6 and 7, 1972. These hearings included evidentiary hearings on motions to suppress by Ford and Madden relating to the existence of probable cause for their arrests.

The record does not affirmatively indicate that either the state or the defendants intentionally delayed this case. Apparently, it was the complexity of the case, as much as anything, which led to the delay in this case.

The third factor to be considered is the defendant's assertion of his right to a speedy trial. The failure to demand a speedy trial does not constitute a waiver of that right. *Day v. State, supra,* at page 246. As the

supreme court noted in *Barker v. Wingo, supra,* 407 U. S. at 527:

". . . A defendant has no duty to bring himself to trial; the State has that duty as well as the duty of insuring that the trial is consistent with due process."

However, the supreme court said that this does not mean that an accused has no responsibility to assert his right: (p. 528)

". . . We think the better rule is that the defendant's assertion of or failure to assert his right to a speedy trial is one of the factors to be considered in an inquiry into the deprivation of the right."

All defendants here admit that they made no demands for a speedy trial. As has been noted, on November 16, 1972, counsel for the three defendants stated they were not demanding an immediate trial when a date in early December was offered.

The fourth factor to be considered is the prejudice to the defendant. In discussing this point, the supreme court said: (p. 532)

"A fourth factor is prejudice to the defendant. Prejudice, of course, should be assessed in the light of the interests of defendants which the speedy trial right was designed to protect. This Court has identified three such interests: (i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired. Of these, the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system."

Because the three defendants were incarcerated during the proceedings some prejudice is present. Also, there may have been prejudice because of the anxiety and concern on their part, although the defendants do not mention this point. As to the third point, the defendants

do not argue they were prejudiced in presenting their defenses and the record does not affirmatively indicate they were. Madden and Shears did not present any defense and Ford was his own key witness, although he did call other witnesses. Balancing any prejudice that existed as against the other factors referred to, it cannot successfully be maintained that defendants were denied a speedy trial.

*Severance.*

Defendants Madden and Ford were initially charged in a single complaint. They requested severance of their cases. On September 5, 1972, the state's motion for consolidation of Ford's, Madden's, Shears' and Zilanis' cases was granted by the trial court. Zilanis' case was severed prior to trial.

A trial court does have the power to try cases together when the defendants are charged with the same offenses arising out of the same transaction and provable by the same evidence. *Jung v. State* (1966), 32 Wis. 2d 541, 545, 145 N. W. 2d 684. Consolidation is, ordinarily, a matter entirely within the discretion of the trial judge. *Cullen v. State* (1965), 26 Wis. 2d 652, 133 N. W. 2d 284.

We have held that if codefendants assert antagonistic defenses they are entitled to separate trials. *State v. Nutley* (1964), 24 Wis. 2d 527, 542, 129 N. W. 2d 155. This position has also been taken in two more recent decisions:

"There are, of course, circumstances where a joint trial would be unduly prejudicial to the interests of either or both of the defendants; and in that case the interests of administrative efficiency must yield to the mandates of due process. Such circumstances are found where the defendants intend to advance conflicting or antagonistic defenses. . . . Severance may also be required when:

" '. . . there would be presented at the trial "an entire line of evidence relevant to the liability of only one

defendant." . . .' *Cullen v. State* (1965), 26 Wis. 2d 652, 656, 133 N. W. 2d 284." *State v. DiMaggio* (1971), 49 Wis. 2d 565, 576, 577, 182 N. W. 2d 466, certiorari denied, 404 U. S. 838, 92 Sup. Ct. 127, 30 L. Ed. 2d 70. *See also: Lampkins v. State* (1971), 51 Wis. 2d 564, 572, 187 N. W. 2d 164.

The three defendants all argue that entire lines of evidence only applicable against the other two or one of the other two were offered in this case. While there was evidence not applicable to all of the defendants, the existence of a conspiracy was established. George Bryant testified that he met with Madden, Ford, Shears and others in Chicago at which time the robbery of a tavern in Madison was discussed. The planning included how they would get to Madison with the guns and how they would return. Alexis Tolson testified that the three defendants and others were present in her apartment on January 12th and 13th and she heard them discussing a robbery of Harold's Club. She had seen guns in her apartment and had stolen nylons for the defendants. Lumumba Kenyatta testified that he was at Tolson's apartment on January 12th and 13th and that he picked Madden up at the bus station at Ford's request. Shears had arrived with Ford and, after Madden's arrival, he heard the defendants discussing a Madison tavern.

The "star witness" was Eugene Sills who testified that he also was present with the defendants at Tolson's apartment where the armed robbery of Harold's Club was discussed. He further testified that he saw all three defendants inside Harold's Club at the time of the robbery.

While certain evidence not relating to all three defendants was received, their connection together and to the crimes involved, was established. Therefore, it was not an abuse of discretion to deny a severance on the one-line-of-evidence doctrine. In discussing the applicability of this doctrine in *State v. DiMaggio, supra,* this court said:

"It is the 'entire-line-of-evidence' doctrine which the defendant Pipito here asserts. This is a difficult call for the trial judge to make since he cannot tell prior to trial exactly what evidence applicable to whom, will be introduced. If it appears during the course of the trial that a good deal of evidence applicable to only one defendant is being developed, the trial judge has an option. He may order a severance at that time *(Nutley, supra)* or the court may elect to give the jury a cautionary instruction to the effect that evidence against one may not be treated as evidence against all, simply because they are being tried together." (p. 577)

Here the jury was instructed that it must judge the guilt or innocence of each of the defendants separately. The jury's ability to do so in this case was demonstrated by its returning a verdict of guilty on the concealed identity charge only against Ford.

Ford does not argue that antagonistic defenses were presented, but the other two defendants do. Ford was the only defendant to call witnesses in his defense. He also took the stand to testify on his own behalf. He attempted to establish the defense of withdrawal. In doing so, his testimony corroborated, for the most part, the testimony of Bryant, Tolson, Kenyatta and Sills. His testimony differed from Kenyatta's and Sills' in that he stated he backed out of the armed robbery when the defendants arrived at Harold's Club.

Ford said he was attempting to steal one of the cars in the parking lot to get away when he heard shots. Sills came up behind him in the parking lot and Ford asked what had happened. Before Sills answered, a police car turned into the parking lot near where they were standing and the two ran. He was arrested with Sills following the chase.

Defendants, in their pretrial motions, had requested a severance and had argued antagonistic defenses may be presented. The court denied the requests, but stated that if it developed at trial he would sever the cases

then. When Ford's trial counsel began his opening state-ment by telling the jury that the evidence they had heard previously was substantially true and that the three defendants did come to Madison to rob Harold's Club, Madden's trial counsel objected and said that that was an antagonistic defense. The trial court refused to sever the cases saying that it wasn't antagonistic but goes to credibility and is for the jury to weigh.

The testimony of Ford was merely cumulative to the testimony of Bryant, Tolson, Kenyatta and Sills which had already been received. Partial corroboration of gov-ernment testimony by a codefendant is not grounds for severance. *United States v. Wilson* (D. C. Cir. 1970), 434 Fed. 2d 494, 501, 502.

There is a serious question as to whether Ford's testimony relative to his withdrawal constituted a de-fense. There is ample evidence to establish that the crimes of robbery and murder had been committed prior to Ford's alleged physical withdrawal from the scene. In any event, no added burden of defense was placed on Madden and Shears by Ford's testimony so that he can claim to have been prejudiced by an antagonistic defense. The trial court did not abuse its discretion in denying defendants' motions for severance.

*Denial of impartial jury.*

All three defendants argue that they were denied the right to be tried before an impartial jury by the refusal of the trial court to submit to the prospective jurors on *voir dire* questions relating to their racial attitudes.

In this case, the court refused to allow counsel to ask some of the submitted questions. Some questions which the court rejected were: Do you believe that there is a need for a revolution today in America? Do you believe that the black Afro-American should believe in the Christian philosophy? What color is God? Do you believe

in black liberation? What is your opinion of the whore-house theory of law? Do you feel that your status is superior or inferior to that of the defendants on trial?

When counsel questioned the veniremen individually on *voir dire,* however, questions regarding racial attitudes were asked. Not all of the veniremen were asked all of the same questions, but the following are some of the questions which were asked: Have you had any dealings or experiences with black people that might make it difficult for you to sit as a juror in this case? Are black people more apt to commit crime? Do you have a personal view as to interracial dating? Do you have any racist tendencies? What black American, living or dead, do you admire most? Questions regarding open housing and organizations which exclude blacks were also asked.

These questions certainly meet the requirement of *Ham v. South Carolina* (1973), 409 U. S. 524, 93 Sup. Ct. 848, 35 L. Ed. 2d 46. In that case, the United States Supreme Court held that it was error for a South Carolina trial court to refuse the defendant's request that it interrogate jurors on *voir dire* as to possible racial prejudice. The two questions regarding racial attitudes requested in *Ham* were:

"1. Would you fairly try this case on the basis of the evidence and disregarding the defendant's race?
"2. You have no prejudice against negroes? Against black people? You would not be influenced by the use of the term 'black'?" (p. 525, fn. 2)

There is no doubt that if these questions would be sufficient, the questions asked by counsel in the instant case were sufficient.

The trial court did not abuse its discretion by limiting inquiry by counsel into racial prejudice on *voir dire.* It did allow numerous questions to be asked and the questions were sufficient to focus the attention of the veniremen on any racial prejudice they might have. The defendants' arguments are without merit.

*Parties to a crime.*

The initial complaint against Ford and Madden charged them with the commission of the substantive crimes without citing sec. 939.05, Stats. All of the subsequent complaints and the information cited the substantive sections as well as sec. 939.05 (2) (c). These charges referred to all of the defendants as principals. The trial court, in instructing the jury, gave the applicable instructions for the crimes charged, as well as instructions on aiding and abetting and conspiracy.

Under sec. 939.05, Stats., anyone "concerned in the commission of a crime" is a principal. Therefore, it is proper to charge a conspirator or an aider and abettor as a principal. The purpose behind the enactment of sec. 939.05, was to abolish the common-law distinctions between principals and accessories to crime. 1953 Report of the Wisconsin Legislative Council, vol. V, p. 6.

The defendants argue that sec. 939.05, Stats., is unconstitutional in that it denied them of adequate notice of the charges against them. A similar argument was made in *State v. Cydzik* (1973), 60 Wis. 2d 683, 687, 211 N. W. 2d 421. This court stated:

"The information charged the defendant with first-degree murder as a party to the crime. Defendant claims error in the failure of the information to set forth the specific subsection of the party-to-a-crime statute relied upon. The statute does not require that a defendant be specifically charged with violation of the section, stating instead, 'Whoever is concerned in the commission of a crime is a principal.' This court has held that it is not mandatory to refer to the party-to-a-crime section, giving as one reason the fact that 'it is often difficult to tell in advance of filing the information whether to charge the defendant as the principal or under this section as a party to the crime.' This reason applies to reference to a subsection at least as much and as well as it does to reference to the section. Where reference to the party-to-a-crime section is not mandatory, we see no reason to hold referring to a particular subsection to be required."

This court has repeatedly held that it is not mandatory to refer specifically to sec. 939.05, Stats., although it is preferable to do so. *Hardison v. State* (1973), 61 Wis. 2d 262, 271, 212 N. W. 2d 103, and cases cited therein.

The defendants also argue that it is necessary to enumerate the party who actually committed the acts charged. In *Feldstein v. United States* (9th Cir. 1970), 429 Fed. 2d 1092, 1095, certiorari denied, 400 U. S. 920, 91 Sup. Ct. 174, 27 L. Ed. 2d 159, rehearing denied, 400 U. S. 1002, 91 Sup. Ct. 452, 27 L. Ed. 2d 454, it was stated:

"Feldstein argues that he should not have been convicted of aiding and abetting where the alleged principal, Rosciano, was never tried. This is not the law. All that the prosecution need prove is that the offense has been committed. It is not even necessary that the identity of the principal be established, much less that he be convicted. *See United States v. Provenzano,* 3 Cir., 1964, 334 F. 2d 678, 691; *Hendrix v. United States,* 5 Cir., 1964, 327 F. 2d 971, 975, and the many cases there cited. Similarly, in the conspiracy charge, one can be convicted even though the indictment against all the other conspirators has been dismissed. Such conspirators need not even be charged. *Ng Pui Yu v. United States,* 9 Cir., 1965, 352 F. 2d 626, 633."

Therefore, the failure to specify the primary actor is not fatal.

*Failure to instruct as to weight to be given the testimony of Bryant, Tolson and Kenyatta.*

The defendants argue that they should be granted new trials because the trial court failed to instruct the jury on the weight to be given the testimony of the accomplices who testified for the state. The claim is that the court should have included the names of Bryant, Tolson and Kenyatta in its instruction on the weight to be given Eugene Sills' testimony. The court gave the following instruction on this point:

"Eugene Sills has testified on behalf of the state, and if his testimony is true, he participated in the crime of armed robbery, which is one of the four counts charged in the Information against the defendants. There is also testimony that Mr. Sills participated in discussions with the defendants concerning the planning of the robbery at Harold's Club.

"You are instructed that the evidence of an accomplice or co-conspirator is competent evidence in a criminal case upon which to base a verdict of guilty, provided it is of such a character, taken in connection with all the other evidence in the case, so as to satisfy you of the guilt of the defendant in such case beyond a reasonable doubt; but, ordinarily, it is unsafe to convict upon the uncorroborated testimony of an accomplice or co-conspirator. Therefore, you should examine such evidence with utmost care and caution, scrutinize it closely, and weigh it in the light of all the attending circumstances as shown by all the evidence in this case.

"You should not base a verdict of guilty as to any defendant upon it alone, unless after such scrutiny and consideration it satisfies you of the guilt of the defendant under consideration beyond a reasonable doubt.

"It is the rule that the testimony of an accomplice or co-conspirator is to be carefully examined and scrutinized and is to be given only such weight and credit as under all of the circumstances you believe it is fairly entitled to receive. If, however, it appears to you to ring true, then you are entitled to believe it and base your findings at least in part upon such testimony."

The jury was also given general instructions as to what factors to consider in determining the weight it should give a witness' testimony. Included in these factors were the witness' interest in the result, his or her bias or prejudice or possible motives for falsifying, and all other factors appearing at trial which would discredit his testimony.

In *Bizzle v. State* (1974), 65 Wis. 2d 730, 223 N. W. 2d 577, this court held it was not error to refuse to instruct the jury as to the weight to be given an accomplice's testimony where corroboration of the testimony exists.

In this case, no such instruction was requested. This court has generally held that a failure to timely object to jury instructions is a waiver of any alleged defects in those instructions. *State v. Cydzik, supra,* page 694. We see no compelling circumstances existing in this case to merit an exception to the rule. The defendants' objection in this case has been waived.

### Third-degree murder instruction.

Defendants contend that the court erred in not giving a jury instruction on the lesser-included offense of third-degree murder. This court has frequently restated the rule as to when an instruction on a lesser-included offense should be given.

"This court has continually held that '. . . to justify the submission for conviction of a lesser offense included in a greater crime there must be some reasonable ground in the evidence for a conviction of the lesser offense and an acquittal of the greater offense.' *State v. Melvin* (1970), 49 Wis. 2d 246, 252, 181 N. W. 2d 490." *Laster v. State* (1973), 60 Wis. 2d 525, 536, 211 N. W. 2d 13.

More recently, it was restated:

"In [*Ross v. State* (1973), 61 Wis. 2d 160, 211 N. W. 2d 827], we stated that the lesser-included offense should be submitted only if there is a reasonable doubt as to some particular element included in the higher degree of crime. In the instant case the only doubt expressed by counsel on this appeal is doubt whether the requisite intent was shown. That doubt, if raised by the evidence at all, is so insubstantial that it is not a reasonable doubt." *Hayzes v. State* (1974), 64 Wis. 2d 189, 195, 196, 218 N. W. 2d 717.

This court has also addressed itself to the question of submitting third-degree murder where first-degree murder is charged:

"The defendant contends that since he was perpetrating an armed robbery at the time the victim was killed,

that any death that results therefrom is necessarily third-degree murder. Defendant bases this contention upon this court's statement in *State v. Carlson* (1958), 5 Wis. 2d 595, 608, 93 N. W. 2d 354:

" '. . . [T]hird-degree murder is a combination of a felony or attempted felony, and the fact that in the commission or attempt a death was caused.'

"While the defendant's description of the crime of third-degree murder is correct, such is not controlling." *State v. Estrada* (1974), 63 Wis. 2d 476, 482, 217 N. W. 2d 359.

In *Laster v. State, supra,* at 537, it was pointed out that the mere fact that a defendant was fortuitous enough to be committing a felony at the time he intentionally caused the death of a human being is not enough to justify an instruction on third-degree murder.

Applying the rule to the facts of the instant case it is obvious that it would have been unreasonable to instruct the jury that they might find the homicide of James Rehbein to have been third-degree murder. The testimony of Randall Stapelman, a patron, was that the gunman was leaning over the bar and Rehbein was backing way when he was shot. Robert Currie, also a patron, testified that after hearing shots he saw Rehbein back up with his arms up and then Currie heard more shots. Rehbein was shot three times at close range. One bullet passed directly through his heart which was proved to be the fatal shot.

At trial an attempt was made to show that Rehbein may have been killed unintentionally in a struggle. However, there was no testimony regarding any struggle between Rehbein and his assailant and one witness expressly stated that he saw no struggle. Under these circumstances, it would have been unreasonable to conclude no intent to kill Rehbein existed.

The evidence is sufficient as well to have permitted the jury to convict the defendants of the first-degree murder of Lester Hanson.

Hanson was shot by one of the conspirators, evidence showed, when he tried to sneak out of the bar area to get to a phone in the kitchen. Hanson was shot in the lower abdomen, the bullet disintegrating the bowel wall and spraying fecal material through the abdominal cavity. It was impossible to clean out all fecal material. The presence of some remaining fecal material resulted in blood poisoning from which Hanson died.

Obviously, it must be inferred, Hanson intentionally was shot to prevent him from leaving. Immediately after this shooting, Ford was seen standing over Hanson. The assailant could have prevented Hanson's departure without firing into a vital zone. Just prior to the shooting of Hanson, one of the conspirators threatened, "We have already killed one person, and we will kill another."

Hanson's testimony established that he was shot in the lower abdomen as he was trying to sneak to the kitchen. That he heard some people coming near him and one said "Should we get this one too?" The reply was "No, he's gone now anyway." From this testimony the jury could have inferred the intentional killing of Lester Hanson.

There was testimony by Eugene Sills that his gun accidently discharged approximately the same time that Hanson was shot. However, he further testified that his gun discharged after he saw Hanson fall and observed Ford standing over him. The conjecture of an accidental shooting could not reasonably support an instruction on third-degree murder.

Although the trial court expressed some doubt as to whether or not a third-degree murder instruction should have been given to the jury, as to the Hanson murder, we think the trial judge properly denied the request

of an instruction of third-degree murder. There was no reasonable doubt as to the requisite intent of Hanson's assailant.

*Sufficiency of the evidence.*

The defendants argue that the evidence is insufficient to support their convictions. The test of the sufficiency of the evidence on review was recently restated in *State v. Powers* (1974), 66 Wis. 2d 84, 91, 224 N. W. 2d 206:

"The test for determining the sufficiency of the evidence is whether the evidence adduced, believed and rationally considered by the jury, was sufficient to prove the defendant's guilt beyond a reasonable doubt. *Gauthier v. State* (1965), 28 Wis. 2d 412, 416, 137 N. W. 2d 101. . . ."

There can be no question that a conspiracy to commit armed robbery existed between the defendants and others. This is well established by the testimony of Kenyatta, Tolson, Bryant, Sills and Ford. Sills' testimony places all defendants in the tavern at the time of the shootings and armed robbery. Therefore, the acts of any one of the conspirators committed in the prosecution of the common design would make all the defendants criminally liable.

Randall Stapelman, a patron, testified that he heard a shot and saw a man shooting Rehbein and saw him fall. The shooter appeared to him to be leaning over the bar and Rehbein was backing away when Stapelman first saw him. A black man wearing a mask later held a gun on Stapelman.

Mr. Currie testified that he heard shooting and hollering and saw Rehbein go back to the rack on the other side of the bar with his hands in the air. He then heard more shooting and saw Rehbein come forward. Currie then fell to the floor and was later ordered to his feet

by a black man with a pistol and gave the man close to $500. He had also heard a man say "We have already killed one person and we will kill another."

Testimony taken of Lester Hanson prior to his death was read into the record. He said he saw some "awful scuffling right in back of the bar" and then he heard shots. He dropped down and tried to sneak to the kitchen to a telephone. He heard another shot and was hit by a bullet as he was trying to get to the kitchen. He heard some people coming near him and one said "Should we get this one too?" There was a reply "No, he's gone now anyway."

There was a great deal more evidence produced which supported the convictions. We find no merit to defendants' contentions on the issue of sufficiency of the evidence.

*New trial in the interest of justice.*

Defendants ask this court to grant a new trial in the interest of justice. This court, in discussing its authority to grant a new trial for this reason, has recently said:

"In order to grant a new trial in the interest of justice under 251.09, Stats., this court must be convinced, viewing the record as a whole, that there has been a probable miscarriage of justice or that a new trial would lead to a different result." *Rohl v. State* (1974), 65 Wis. 2d 683, 703, 223 N. W. 2d 567.

We are satisfied that there has not been a miscarriage of justice or that a new trial would lead to a different result. We find no basis for ordering a new trial in the interest of justice under sec. 251.09, Stats.

*Sentences.*

Defendants Shears and Madden contend that the trial court abused its discretion in imposing the sentences it did upon them. Two aspects of the sentences are challenged. The first is that the trial court apparently was

of the belief that it could correct a possible error at trial by making the life sentences concurrent. The trial court stated:

"You might ask why I did that. I did that for a number of reasons. One of the reasons is that in my opinion it's very arguable that—I don't think it is with the death of Rehbein, I think that was first degree and nothing else, on the basis of the evidence.

"But Lester Hanson, the bullet passed through the lower part of his body, and it's not absolutely clear that that was first degree; and as Mr. Madden so eloquently stated, after the case had gone to the jury, that this was a classic case of felony murder.

"Well, I haven't sufficient reasonable doubt in my mind as to that issue, and rather than complicate this matter for the supreme court, plus the fact that it is very questionable whether a person can be committed for more than one term for his natural life—how many natural lives does a person have?"

The second aspect challenged is that it was an abuse of discretion for the trial court to make the one term consecutive to the other two.

As to making the life sentences concurrent the defendants state that to do so was improper and requires a vacation of the sentence and a granting of a new trial. No authority is cited to support that position. Sec. 940.01, Stats., makes life imprisonment the mandatory sentence for anyone convicted of first-degree murder and the defendants admit that the concurrent sentences are not prejudicial to them.

As to the imposition of the consecutive sentence for armed robbery, the defendants argue that it does nothing but change the defendants' parole eligibility and ask this court to adopt sec. 3.4(b) of the American Bar Association's *Standards Relating to Sentencing Alternatives and Procedures* (approved draft, 1968). These Standards place certain limitations on consecutive sentences. This court has not adopted the ABA guidelines for the

exercise of the sentencing power. *Ruff v. State* (1974), 65 Wis. 2d 713, 727, 223 N. W. 2d 446. The authority for imposing consecutive sentences comes from sec. 973.15 (1), Stats., which provides:

". . . The court may impose as many sentences as there are convictions and may provide that any such sentence be concurrent or that it shall commence at the expiration of any other sentence . . . ."

Because the trial court had the authority to impose consecutive sentences, the question is whether the trial court abused its discretion.

In *Ruff v. State, supra,* this court upheld consecutive sentences imposed on a defendant who had been found guilty of second-degree murder, attempted armed robbery and armed burglary. The defendant's argument in that case was that consecutive sentences were improper because the three crimes involved were part of the same "criminal episode."

Here all defendants were given the same sentences except that Ford was given an additional five-year term for being masked which was to run concurrent with the armed robbery sentence. In passing sentence the court stated it could not think of a more aggravated armed robbery. We conclude there was no abuse of discretion involved in the sentencing of the defendants Madden and Shears.

*Complaints.*

Defendants Ford and Shears both contend that the complaints against them should have been dismissed. While both arguments are directed at the validity of the complaints, they deal with different complaints and are based on different theories so they will be considered separately.

Ford's basis for the challenge to the complaint is that the factual statement includes the assertion that Robert

Currie, the patron who was robbed, identified Ford as being in Harold's Club and as the one who shot Rehbein. During the first preliminary hearing, Currie testified that he could not make a positive identification. On cross-examination, he said that he might have said Ford looked like one of the fellows. He then said he might have identified Ford, but when asked for a "Yes or No" answer, he said he did not identify him. Following the preliminary examination, Judge TORPHY struck from the complaint the references to Currie having identified Ford as not being substantiated by the record. However, he refused to dismiss the complaint because he felt that even absent these assertions, the complaint showed sufficient "probable cause."

Ford characterizes the references to Currie's identification of him as "purposive misrepresentation" on the part of Detective David Branley, the complainant, which requires that the complaint be found to be void. *See: United States v. Botsch* (2d Cir. 1966), 364 Fed. 2d 542, 548. The record does not bear this out, however. Although Currie wasn't quite sure as to his identification of Ford, he may indeed have given such information to the authorities. Therefore, this reference to Currie's statements would not amount to a "purposive misrepresentation" requiring the complaint to be held void. *See: United States v. Sultan* (2d Cir. 1972), 463 Fed. 2d 1066, 1070.

The complaint here is sufficient. Detective Branley, the complainant, signed the complaint on information and belief as well as on personal knowledge. He was dispatched to Harold's Club at 9:21 p.m. and told that shots had been fired. When he went inside the tavern he saw Lester Hanson who told him he had been shot and he saw Rehbein lying face down on the floor in a pool of blood. Branley was told by Currie that three Negro males entered the tavern wearing stockings over their faces and carrying weapons.

Officer Frank Oswald arrived at Harold's Club at approximately 9:25 p.m. Oswald observed two Negro males standing in the parking lot who ran as he approached. One was wearing blue and white striped pants and one had an unidentified object in his hand. Oswald pursued them and informed other officers in the area of this. Another officer turned on a spotlight and saw two figures running toward a baseball diamond. This officer then heard a shot fired. Two officers at the baseball diamond apprehended Ford and Sills there. Sills was wearing blue and white striped pants. A search of the area where the suspects were apprehended resulted in finding two pistols, a holster and two stocking masks.

It is apparent from these facts that this complaint, even absent Currie's identification of Ford, is sufficient. While flight alone is not enough to establish probable cause, it may be conclusive when viewed with other factors. *State v. DiMaggio* (1971), 49 Wis. 2d 565, 574, 182 N. W. 2d 466, certiorari denied, *Pipito v. Wisconsin* (1971), 404 U. S. 838, 92 Sup. Ct. 127, 30 L. Ed. 2d 70.

Shears challenges the complaint on the basis that it does not show the reliability of the informants upon whose information the arrest and subsequent warrant were based. The trial court refused to dismiss the complaint stating that he believed that one who comes forward and admits being involved qualifies as a "citizen-informer" and that there is corroboration between the stories so as to establish reliability.

"It is now well settled that when the complaint is based on other than eyewitness observations of the complainant himself, the reliability of the 'information' on which he bases his 'belief' must be established. A complaint may be based on hearsay, but the reliability of the hearsay information must be established. There must be something in the complaint which shows why the in-

formant should be believed." *State v. Knudson* (1971), 51 Wis. 2d 270, 274, 187 N. W. 2d 321.

This court has recognized that a two-pronged test was established in *Aguilar v. Texas* (1964), 378 U. S. 108, 84 Sup. Ct. 1509, 12 L. Ed. 2d 723, which requires the showing of (1) the underlying circumstances from which the complainant concludes that the informant is reliable, and (2) the underlying circumstances or manner in which the informant obtained his information is reliable.

Shears' argument only goes to the first prong of the *Aguilar* test. This court has recognized that if the information supplied by "citizen-informer" who is a witness to criminal activity and acts with an intent to aid the police in law enforcement because of his concern for society or for his own safety, no further showing of reliability is necessary. *State v. Paszek* (1970), 50 Wis. 2d 619, 184 N. W. 2d 836; *Allison v. State* (1974), 62 Wis. 2d 14, 23, 214 N. W. 2d 437. Also, it has been held that admissions of crimes carry their own indicia of credibility.

". . . it is not possible to cloak the witness with appearance of reliability under the 'citizen-informer' doctrine. It cannot be argued that Lois Hale who is herself directly involved in the criminal activity is acting 'with an intent to aid police in law enforcement because of [her] concern for society or for [her] own safety.' Yet, it is this aforementioned involvement of Lois Hale in the criminal activity in question which lends credibility to her statement." *Laster v. State* (1973), 60 Wis. 2d 525, 534, 211 N. W. 2d 13.

Under the above rules, sufficient reliability has been shown.

The informants who tied Shears into the incident are named: George Bryant, Lumumba Kenyatta and Alexis Tolson. Information attributed as given by Bryant is

that he overheard a discussion in Chicago in January, 1972, between Shears, Johnson, Madden and Ford about plans for a robbery of a tavern in Madison; Madden was to bring guns to Madison by bus; and on January 13, 1972, he heard Johnson state that Shears had screwed up the robbery.

Alexis Tolson informed police that Ford, Johnson and Shears arrived at her apartment in the evening of January 12, 1972, and Kenyatta later picked Madden up at the bus station; that she overheard discussions of robbing Harold's Club; that the majority of the group left her apartment shortly after 9 p.m. and that later Johnson and Zilanis returned to her apartment and said things had gone wrong and that one man had been shot and Shears might have been shot. The information given by Bryant and Tolson was corroborated by Kenyatta.

The complainant further stated that he had numerous conversations with the three informants and believed their information to be true because it was consistent with other facts obtained by the complainant.

The reliability of these informants was sufficiently established. Their information is corroborated by that of each other as well as by certain other information in the complaints. Also, the information supplied by Tolson and Kenyatta indicates some involvement on their part in the incident.

While the trial court characterized the informants as "citizen-informers," it is clear that it did so with the belief that informers whose information implicates them fell within that category. While the category may have been incorrect, the theory of reliability was not.

*Probable cause for arrest of Ford and Madden.*

The trial court found that the officers did have probable cause to arrest Ford and Madden. We agree with that finding.

Both of these defendants were arrested without warrants on the night of the incident. The factual situations surrounding their arrest were different so it is necessary to consider them separately.

In order to determine whether Officers Oswald and Johnson had probable cause to arrest defendant Ford, this court must consider the information which was possessed at the moment of arrest. Only if it can be concluded that the information possessed by Officer Oswald at the time of arrest was sufficient to permit him to reasonably conclude that the offense had been committed and that the defendant committed it can the arrest of Ford be upheld.

The police force is considered as a unit. Where there is police-channeled communication to the arresting officer and he acts in good faith, the arrest is based on probable cause when facts exist within the police department. *State v. Mabra* (1974), 61 Wis. 2d 613, 625, 213 N. W. 2d 545.

At the hearing on the motion to suppress held on December 6, 1972, it was sufficiently established that there was probable cause for Ford's arrest. Officer Ponty, a police dispatcher, testified that he received a call from a party upstairs at Harold's Club who said there had been a shooting there. He dispatched several squad cars to the scene, telling them there had been a shooting. Officer Oswald was one of many officers who responded to the call. He testified that he turned into Harold's Club's parking lot and saw two colored males in the beam of his headlights. One was carrying a handgun and one had on striped pants. These two men ran and he pursued them, notifying other officers to surround the area as he did so. Oswald followed the two through the parking lot, behind Harold's Club and a shopping center and over some railroad tracks. He lost sight of them as they went into a field over the tracks. He returned to his car and informed Special Investigator Carey that

they were headed in his direction. He then proceeded to the field which has little league baseball diamonds on it.

Special Investigator Carey also responded to the dispatch. He was in contact with Oswald and swept the area with his searchlight and saw two silhouettes running in the light and notified the other officers. Officer Oswald stopped the suspects and ordered them to lie down. Oswald testified that the men stopped were the same ones he had seen running from the parking lot. One of them was Ford. This was sufficient probable cause for the arrest of Ford.

Madden was arrested a little over an hour later in the parking lot of a liquor store about six blocks from Harold's Club. Officers were dispatched there because there was a report that a man fitting the description of one of those involved at Harold's Club was there. The description was a colored male with a three-quarter length jacket and highly polished shoes. When the first officers arrived at this parking lot, they saw Madden who fit the description. The officers asked him for identification and he said he did not have any. He then gave his name and said he lived at West 13th Street in Madison. The officer believed there was no West 13th Street in Madison, so he ordered Madden to put his hands on the car. The officer then started to frisk Madden and found an empty holster on Madden's belt. At this time, the officer informed Madden he was under arrest in connection with the armed robbery and murder at Harold's Club.

While law enforcement officers should not be allowed to stop and frisk every black man in the vicinity of a crime, here the suspect had features which fit the description the arresting officers had. It was only after he gave the officers a fictitious address that the search was conducted. An empty holster was found. All these circumstances taken together were sufficient to give an officer probable cause for Madden's arrest. Once prob-

able cause for the arrest existed, the officers could conduct a more thorough search, which they did. Two wads of money were found which included checks payable to Harold's Club.

*Constitutionality of sec. 255.02 (1), Stats.*

Ford and Madden challenge the constitutionality of sec. 255.02 (1), Stats. This section exempts persons in specified occupations from jury duty. Counsel for Madden has included the following note to this argument.

"This argument is advanced at the insistence of the defendant. Counsel believes that the exemptions created by the statutes are 'reasonable classifications' within the meaning of *Hoyt v. Florida* (1961), 368 U. S. 57, 61, 82 S. Ct. 159, 7 L. Ed. 2d 118. Defendant's construction of the statute so as to exclude all members of religious society is obviously erroneous as the statute excludes only 'ministers . . . of any religious society.' Again, counsel believes this classification to be reasonable. Finally, this issue was not raised prior to the selection of the jury and is thus waived."

Clearly, the exemptions of sec. 255.02 (1), Stats., are valid and the statute is constitutional. The interpretation that all members of any religious society are excluded is erroneous. Only certain members of religious groups, the leaders thereof, are excluded. The exclusions provided in sec. 255.02 (1), do not result in the remaining pool of jurors not to be representative of the community. *See: Taylor v. Louisiana* (1975), 419 U. S. 522, 95 Sup. Ct. 692, 42 L. Ed. 2d 690; and *Rawlins v. Georgia* (1906), 201 U. S. 638, 26 Sup. Ct. 560, 50 L. Ed. 899.

*Denial of preliminary examination.*

Shears contends that he was denied equal protection of the laws and due process because he was denied a preliminary hearing. A preliminary hearing was requested at Shears' initial appearance on August 2, 1972,

after being returned to this state by extradition proceedings in Illinois. The request was denied.

The basis for the denial of a preliminary hearing is sec. 970.02, Stats. 1971, which provided:

"(1) At the initial appearance the judge shall inform the defendant:

". . .

"(c) That he is entitled to a preliminary examination if charged with a felony, unless waived, or unless he has been returned to this state by extradition proceedings pursuant to ch. 976 or is a corporation."

Because he was returned to this state by extradition proceedings, Shears was not entitled to a preliminary examination under that section.

This section has been amended by the legislature so that now a defendant who has been returned to this state through extradition proceedings is entitled to a preliminary examination. Laws of 1973, ch. 45, sec. 1. This change became effective June 29, 1973, and, therefore, did not entitle Shears to its benefits.

In *Johns v. State* (1961), 14 Wis. 2d 119, 122, 123, 109 N. W. 2d 490, this court held that the statute dispensing with a preliminary examination was not unconstitutional as denying due process or equal protection. It was reasoned that the process of extradition satisfies the purpose of the preliminary hearing. The court went on to say that because there is no federal or state constitutional right to a preliminary hearing and because the statute is a reasonable exercise of legislative power, a fugitive from justice is not denied due process of law by not being granted a preliminary examination after he has been extradited.

In *State ex rel. Foster v. Uttech* (1966), 31 Wis. 2d 664, 675, 143 N. W. 2d 500, the author of that decision remarked that perhaps there the court had gone too far in characterizing the extradition process as satisfying the purpose of a preliminary examination. Taken out of

context, that statement would undermine the decision in *Johns*. A review of that decision in its entirety indicates the remark is rhetorical; its meaning is that it would be going too far to characterize the extradition process as satisfying the purpose of a preliminary examination if the accused could contest the legality of his extradition only *ex post facto*.

In *Whitty v. State* (1967), 34 Wis. 2d 278, 289, 149 N. W. 2d 557, this court held that:

> "While the denial of a preliminary hearing is not *per se* a breach of a constitutional right, *State v. Strickland* (1965), 27 Wis. (2d) 623, 135 N. W. (2d) 295, nevertheless in the context of this case Whitty's constitutional right to reasonable bail was violated. Such constitutional violation is subject to the harmless-error rule because it did not occur during trial of the issue of guilt or innocence and did not directly affect that issue. We believe the error was harmless beyond a reasonable doubt on the issue of Whitty's guilt or innocence."

Under sec. 970.02 (1) (c), Stats. 1971, Shears was not entitled to a preliminary examination. Under *Johns v. State, supra*, the denial of the preliminary examination did not deny him equal protection or due process of law. If it was error, it was harmless error under *Whitty v. State, supra*.

*Transcripts as evidence at second preliminary.*

Ford argues that he was denied his right of confrontation by the use of the transcripts of the first preliminary examination at a second preliminary examination. The first preliminary examination was held on January 22, 28 and 29, 1972. This involved defendants Ford, Madden and Eugene Sills. At that time, these three were charged with first-degree murder for the death of James Rehbein; attempted murder for the shooting of Lester Hanson; the armed robbery of Robert Currie; and concealing identity. Following this pre-

liminary examination, Ford, Madden and Sills were bound over to the circuit court.

Lester Hanson died on March 25, 1972. Subsequently, another complaint charging the three defendants involved on this appeal and Sills, Johnson and Joan Zilanis with first-degree murder for the death of Lester Hanson was issued. A second preliminary examination was held on May 16, 1972, in connection with this complaint as to Sills, Madden and Ford. At the beginning of this hearing, the state moved to have six volumes of the transcript of the first preliminary examination admitted into evidence. They were received in evidence. Other witnesses were then called by the state and probable cause for binding Ford, Madden and Sills over to the circuit court was found.

Here the second preliminary examination was held to establish that Lester Hanson had died as a result of the bullet wounds suffered during the robbery.

The purpose of a preliminary examination has been met in this case.

"The purpose of the preliminary hearing is to:
" '. . . protect the accused from hasty, improvident, or malicious prosecution . . . and further denying the accused his right to liberty.'
"*Johns v. State* (1961), 14 Wis. 2d 119, 122, 109 N. W. 2d 490; *Whitty v. State* (1967), 34 Wis. 2d 278, 149 N. W. 2d 557." *Taylor v. State* (1972), 55 Wis. 2d 168, 173, 197 N. W. 2d 805.

Probable cause was found for all the elements of the crimes involved. Ford did confront and cross-examine all of the witnesses against him. We find no merit to Ford's contention as to his right of confrontation.

*Counsel of Ford's choice.*

In his pro se brief, Ford argues that he was denied the counsel of his choice. At the commencement of the

proceedings, Ford had been represented by court-appointed counsel. Attorney Arthur Grant of Illinois was then retained to represent Ford. Attorney Grant appeared for Ford at the first preliminary hearing. Local counsel also appeared as is required by Rule 2, sec. 4 of the State Bar Rules. 36 Wis. 2d viii, ix. At the beginning of the second preliminary, however, Attorney Grant appeared for Ford and informed the court that the defendant lacked sufficient funds to retain local private counsel to assist Grant in order to comply with the rules. Grant withdrew from the case when the court stated that he could not appear without local counsel being present. The court then found Ford indigent and appointed the same counsel who had been appointed to represent Ford initially. The defendant was found to be indigent after Mr. Grant withdrew so that counsel was appointed under sec. 970.02 (6), Stats.

The right of an indigent to counsel at public expense does not include the right to counsel of his own choosing. *Rahhal v. State* (1971), 52 Wis. 2d 144, 147, 187 N. W. 2d 800; and *State v. Scarbrough* (1972), 55 Wis. 2d 181, 197 N. W. 2d 790.

"An accused may not fully avail himself of the services of appointed counsel and then, later, disclaim both the services and the appointment when it appears to his advantage . . . ." *People v. Johnson* (1970), 45 Ill. 2d 38, 42, 257 N. E. 2d 3.

In *State v. White* (1973), 59 Wis. 2d 354, 355, 208 N. W. 2d 321 (per curiam) certiorari denied, 415 U. S. 992, 94 Sup. Ct. 1592, 39 L. Ed. 2d 889, this court affirmed by an evenly divided court a refusal to permit a volunteer counsel to assist appointed counsel.

The selection of counsel has been found to be a matter within the discretion of the trial court and it is not necessarily abused by failing to appoint an accused's

choice. *State v. Hollins* (Mo. 1974), 512 S. W. 2d 835, 838.

In this case, the trial court did not abuse its discretion in appointment of counsel. Ford could afford to employ one, but not two, attorneys. He must be satisfied to employ one attorney or have one court-appointed counsel.

*Effective assistance of counsel.*

Ford argues that he was denied his right to the effective assistance of counsel at the second preliminary on May 16, 1972. This argument is based on the fact that after Attorney Grant withdrew from the case, the court denied newly appointed counsel's request for an adjournment to allow him time to refamiliarize himself with the case.

Because this case was tried before *State v. Harper* (1973), 57 Wis. 2d 543, 205 N. W. 2d 1, was decided, the applicable test for competency of counsel is whether the legal representation was so inadequate and of such low competency as to amount to no representation. *Schleisner v. State* (1973), 58 Wis. 2d 605, 608, 207 N. W. 2d 636.

The events concerning substitution of counsel occurred at the commencement of preliminary proceedings on May 16, 1972.

Although the legal services attorney was appointed only minutes before the proceedings commenced, the only matter taken up on that date was the question of whether the transcripts of a previous phase of the preliminary hearing could be used as a partial basis for charging the defendant with murder rather than attempted murder of Lester Hanson. The admissibility of these transcripts was objected to by the counsels for Sills and Madden. Ford's counsel joined in these objections.

The preliminary was then adjourned to May 22, 1972. Ford does not argue that appointed counsel did not provide effective assistance after May 16, 1972. While in most cases, a court should adjourn proceedings to give newly appointed counsel time to prepare, the failure of the court to do so here did not deny Ford his rights in this regard. His counsel was not unfamiliar with the case, having originally represented the defendant, and subsequently having sat in the courtroom during other proceedings in the case. Counsel knew of the intent of the state to move for "admission" of the transcript two weeks in advance of his appointment. There is no merit to defendant Ford's claim of ineffective assistance of counsel.

*Right to remain silent.*

Defendant Ford, in his pro se supplemental brief, argues that he was denied his fifth amendment right of silence by improper prosecutorial comment during closing argument. The assistant district attorney, on closing argument, stated:

"In conclusion, ladies and gentlemen, I will state this —No, excuse me—But in regard to defendant Ford, if defendant Ford didn't go into Harold's Club, why didn't he tell law enforcement officials before? The incident occurred January 13th."

Ford also points out that the matter of his silence prior to the trial had initially been brought up on cross-examination and he contends that this also was an infringement on his right to remain silent. On cross-examination, Ford was asked if he had ever told law enforcement authorities the story that he testified to on direct examination and he said he had not.

No objection was made to either the question asked on cross-examination or the comment during closing argu-

ment. No motion for a mistrial was made. Failure to move for a mistrial because of alleged impropriety in the prosecutor's closing argument waives that complaint. *Davis v. State* (1973), 61 Wis. 2d 284, 287, 212 N. W. 2d 139. Also in *State v. Cydzik, supra,* 695, it was said that ". . . An objection to improper argument must be voiced when it is made or, at the very latest, prior to return of the verdict."

No objections or motions for a mistrial were made in this case by or on behalf of Ford. Therefore, he has waived his objections to the question and the comment by the district attorney.

We think that the defendants received a fair trial and that justice was done in these cases. None of the arguments of defendants has sufficient merit to warrant a new trial and, therefore, the orders denying post-conviction motions must be affirmed.

*By the Court*—Orders affirmed.