STATE of Wisconsin, Plaintiff-Respondent,

v.

Douglas CHEERS, Claven Ladell Crockett,
Defendants-Appellants.

Supreme Court

*No. 79–1454–CR. Argued March 3, 1981.—Decided June 15, 1981.*

(Also reported in 306 N.W.2d 676.)

368

For the appellants the cause was argued by *Ann B. Petersen*, assistant state public defender, with whom on the brief were *Louis B. Butler, Jr.*, and *William J. Tyroler*, assistant state public defenders.

For the respondent the cause was argued by *Chris Heikenen*, assistant attorney general, with whom on the brief was *Bronson C. La Follette*, attorney general.

COFFEY, J.  This is an appeal from judgments of conviction entered in the circuit court for Milwaukee county, the Hon. FREDERICK P. KESSLER presiding. This case is before this court on a bypass of the court of appeals, pursuant to sec. 808.05 and sec. (Rule) 809.60, Stats.

Following a jury trial, the circuit court convicted the defendants, Douglas Cheers and Claven Ladell Crockett of three counts of armed robbery, party to the crime, with the use of force against the person of the owner,

contrary to secs. 943.32(1)(a) and (2)[1] and 939.05, Stats. 1977. The trial court entered judgment on the verdicts, and thereafter, pursuant to a plea bargain, the defendants entered pleas of no contest to a fourth count of armed robbery, party to the crime with the threat of the imminent use of force in violation of secs. 943.32(1) (b) and (2) and 939.05, Stats. 1977. After receiving the testimony on the no contest plea, the court entered judgments convicting the defendants on the fourth count of armed robbery (threat to use force). Complying with the plea negotiation, the district attorney moved the court to dismiss but read into the court record the three remaining crimes charged in the seven-count information—armed burglary, party to the crime, two counts, attempted armed robbery, party to the crime, to be considered by the court at the time of sentencing. On

---

[1] Sec. 943.32, Stats. 1977, provides:

"**Robbery.** (1) Whoever, with intent to steal, takes property from the person or presence of the owner by either of the following means is guilty of a Class C felony:

"(a) By using force against the person of the owner with intent thereby to overcome his physical resistance or physical power of resistence to the taking or carrying away of the property; or

"(b) By threatening the imminent use of force against the person of the owner or of another who is present with intent thereby to compel the owner to acquiesce in the taking or carrying away of the property.

"(2) Whoever violates sub. (1) while armed with a dangerous weapon is guilty of a Class B felony.

"(3) In this section 'owner' means a person in possession of property whether his possession is lawful or unlawful."

Subsection 2 of this statute was repealed and recreated by ch. 114 of the Laws of 1979, effective March 1, 1980, to provide:

"(2) Who violates sub. (1) by use or threat of use of a dangerous weapon or any article used or fashioned in a manner to lead the victim reasonably to believe that it is a dangerous weapon is guilty of a Class B felony."

the first three armed robbery counts, defendant Crockett was sentenced to three consecutive ten-year terms and the fourth armed robbery sentence was ordered to be served concurrent with the sentence in count number one. Defendant Cheers was sentenced to two consecutive ten-year terms on the first two counts, and a five-year consecutive term on the third count and the sentence on count number four was ordered to be served as a concurrent ten-year sentence with the sentence imposed in count number one. The court further ordered that each of the defendants be given 101 days' credit for the time spent in pre-trial confinement. The defendants' notices of appeal state that they appeal from the judgments of conviction on all four counts of armed robbery, party to the crime.

On appeal, both defendants, Cheers and Crockett, contend that the trial court erred when instructing the jury that it could find them guilty of the three counts of armed robbery, party to the crime, with the use of force, contrary to secs. 943.32(1)(a) and (2) 939.05, Stats. 1977, if it found that they either *threatened the use of force* or *used force* against their victims in the commission of the armed robberies. The defendants claim that this type of instruction violates their constitutional rights in that it deprived them of: (1) the right to a unanimous jury verdict; (2) the right to have every element of the crime charged proved beyond a reasonable doubt; and (3) the right to timely notice of the crime charged (armed robbery with either force *or* threat of use of force) and the opportunity to defend the same. Additionally, defendant Cheers argues that the trial court failed to acquire personal jurisdiction over him as he contended his arrest was without probable cause. Cheers further asserts that the trial court erred in admitting out-of-court and in-court iden-

tifications of him in evidence claiming that these identifications flow directly from his alleged unlawful arrest and therefore should have been suppressed under the fruit of the poisonous tree doctrine.[2]

The defendants' convictions arose out of their alleged participation in the armed robberies of two residences in the city of Milwaukee: one at 3300 West Lisbon Avenue on December 13, 1978, and the other at 3250 North 9th Street on December 15, 1978. Three persons, Marilyn Sue Netterville, Lornell Reid and David Reid, were victimized during the course of the armed robbery at the West Lisbon Avenue address, and those robbed at the 9th Street location were Edna Earl Ward and Richard Nicksion. Shortly after the two armed robberies, Netterville, Ward and Nicksion identified Crockett as one of the assailants from a police photographic display. This photographic identification led to the issuance of a warrant for Crockett's arrest and a complaint charging him with three counts of armed robbery with the use of force as party to the crime (one count each relating to each of the victims of the robberies at 3300 West Lisbon Avenue) and one count of party to the crime of armed robbery with the threat of imminent use of force relative to the robbery of Edna Ward at the North 9th Street address.

Crockett was arrested pursuant to this warrant at a residence known at 2479 West Fond du Lac Avenue, Milwaukee, on December 19, 1978, and defendant Cheers was arrested outside the same house as he attempted to gain entry to the residence, five to ten minutes before the arrest of Crockett. The officers' failure to possess

---

[2] *See: Wong Sun v. United States*, 371 U.S. 471 (1963) and *United States v. Crews*, 445 U.S. 463 (1980). Cf. *State v. Brown*, 50 Wis.2d 565, 185 N.W.2d 323 (1971) and *Schaffer v. State*, 75 Wis.2d 673, 250 N.W.2d 326 (1977).

a warrant for the arrest of Cheers and the circumstances leading up to and surrounding his arrest from the basis for Cheers' claim that his arrest was unlawful as being without probable cause.

On the morning following their arrest, Cheers, Crockett and the four other black males taken into custody the evening before participated in a police identification lineup. At the lineup, four of the victims, Lornell Reid and his brother, David Reid, (robbery at 3300 West Lisbon) as well as Edna Ward and Richard Nicksion (robbery at 3250 North 9th Street) identified Cheers as one of the robbers. After the lineup, a complaint was filed charging Cheers with being a party to the armed robbery crimes at 3300 West Lisbon Avenue and 3250 North 9th Street.

Prior to the preliminary examination, Cheers challenged the court's jurisdiction with a motion to suppress claiming his arrest and lineup were the fruit of an illegal arrest without probable cause. The court denied this motion ruling that it must be brought before the trial court. After the preliminary hearing, the court found probable cause to believe the defendants committed the crimes charged and bound Cheers and Crockett over for trial.

The district attorney issued an information charging the defendants with the crimes recited in the complaint[3] and Cheers renewed his motion to dismiss for

---

[3] The information provided in part:

"COUNT #1 ARMED ROBBERY (PTAC)

"On 12/13/78 at 3300 West Lisbon Ave., City of Milwaukee, as party to a crime, with intent to steal, did take property from the person of Marilyn Sue Netterville, the owner, by using force against the person of the owner, Marilyn Sue Netterville, and while armed with dangerous weapons, to wit: shotguns and handguns, with intent thereby to overcome the said owner's physical resistance or physical power of resistance to the taking and carry-

want of jurisdiction as well as his motion to suppress his out-of-court identification (and any subsequent identification), grounding both motions on his claim that his warrantless arrest was unlawful as being without probable cause. After the hearing on these motions where testimony was presented from one of the arresting officers (Dieter Kraemer) and the defendant Cheers, the trial court denied the motions finding that the arrest

ing away of said property, contrary to Wisconsin Statutes sections 943.32(1)(a) and (2) and 939.05.

"COUNT #2 ARMED ROBBERY (PTAC)

"On 12/13/78 at 3300 West Lisbon Ave., City of Milwaukee, as party to a crime, with intent to steal, did take property from the person of Lornell Reid, the owner, by using force against the person of the owner, Lornell Reid, and while armed with dangerous weapons, to wit: shotgun and handguns, with intent thereby to overcome the said owner's physical resistance or physical power of resistance to the taking and carrying away of said property, contrary to Wisconsin Statutes sections 943.32(1)(a) and 2 and 939.05.

"COUNT #3 ARMED ROBBERY (PTAC)

"On 12/13/78 at 3300 West Lisbon Ave., City of Milwaukee, as party to a crime, with intent to steal, did take property from the person of [David] Cornell Reid, the owner, by using force against the person of the owner, Cornell Reid, and while armed with dangerous weapons, to wit: shotguns and handguns, with intent thereby to overcome the said owner's physical resistance or physical power of resistance to the taking and carrying away of said property, contrary to Wisconsin Statutes sections 943.32 (1)(a) and (2) and 939.05.

"COUNT #4 ARMED ROBBERY (PTAC)

"On 12/15/78 at 3250 North 9th Street, City of Milwaukee, as party to a crime, with intent to steal, did take property from the presence of Edna Earl Ward, the owner, by threatening the imminent use of force against the person of Edna Earl Ward, and while armed with dangerous weapons, to wit: shotguns and handguns, with intent thereby to compel the said owner to acquiesce in the taking and carrying away of said property, contrary to Wisconsin Statutes sections 943.32(1)(b) and (2) and 939.05."

was valid (sec. 968.07(1)(d), Stats.[4]), as the arresting officers had reasonable grounds to believe that Cheers fit the description of one of the persons that had participated in the armed robberies with Crockett, and further was apprehended while attempting to enter the house where Crockett was known to be residing.

At the time of trial, the first three counts in the information charging the defendants with being party to the crime of armed robberies (use of force) relating to the robberies at the West Lisbon Avenue address[5] were severed on the defendants' motion from the 3250 North 9th Street count and the case proceeded to trial on the first three counts.

Following the presentation of the state's case, the defense rested without offering any evidence and the court proceeded to instruct the jury on the crime of armed robbery as follows:

"Armed robbery as defined in 943.32 of the Criminal Code of Wisconsin is committed by one who, with intent to steal, and armed with a dangerous weapon *threatens the imminent use of force* against the owner or another who was present with the intent to compel the owner to submit to the taking and carrying away of property.
". . .

"Before the defendants may be found guilty of armed robbery, the State must prove by evidence which satisfies you beyond a reasonable doubt that there were present the following four elements of the offense.

---

[4] Sec. 968.07, Stats., provides in part:

"**Arrest by a law enforcement officer.** (1) A law enforcement officer may arrest a person when:

". . .

"(d) There are reasonable grounds to believe that the person is committing or has committed a crime."

The "reasonable grounds" standard recited in this statute is what is more commonly referred to as probable cause. *Ball v. State*, 57 Wis.2d 653, 659, 205 N.W.2d 353 (1973).

[5] *See:* n. 3, supra at page 374–375.

" . . .

"Third, that the defendants *threatened the imminent use of force* against such persons [owners] to compel such persons to acquiesce in the taking and carrying away of the property. 'Imminent' as used here means near at hand or at the point of happening.

"If you are satisfied beyond a reasonable doubt from the evidence in this case that in count one, Marilyn Netterville, in count two, Lornell Reid, and in count three, [David] Cornell Reid, had possession of property and that the defendants intentionally took and carried away the property from the persons of Marilyn Netterville in count one, Lornell Reid in count two, Cornell Reid in count three; that at the time of such taking and carrying away the defendants had the intent to steal the property from Marilyn Netterville in count one, Lornell Reid in count two, and Cornell Reid in count three; *that the defendants either used force against the persons in possession of the property* with the intent to overcome their physical resistance or physical power of resistance to such taking and carrying away of the property, [sic] *that the defendants threatened the imminent use of force against the persons in possession* or any other person who was present with the intent to compel the person in possession to acquiesce to the taking and carrying away of the property, and that the defendants did this while armed with a dangerous weapon, you should find the defendants guilty of armed robbery as charged in the information. If, however, you are not so satisfied, you must find the defendants not guilty of armed robbery." (Emphasis supplied.)

The court gave the standard instruction on jury unanimity.[6] The defendants failed to interpose any objection to the armed robbery instruction (threat or use of force) before the trial court either at the instruction conference or before, during or after the jury charge.[7]

---

[6] *See:* Wis. J I—Criminal, sec. 515.

[7] The state argues that the defendants' failure to object to the disjunctive armed robbery jury instruction during or after trial constituted a waiver of their right to raise the issue on appeal. This court agreed to consider the jury instruction issues

The jury subsequently returned verdicts finding each of the defendants guilty of three counts of armed robbery (party to the crime) in the manner and form as charged in the information. Shortly thereafter, pursuant to a plea negotiation, the defendants, entered pleas of no contest to the charge of party to the crime of armed robbery, (threat of use of force) relating to Edna Ward at 3250 North 9th Street, and, in accordance with the plea negotiation, three other charges relating to the incident at that location (two counts of armed burglary and one count of attempted armed robbery, party to the crime) were dismissed on the record but considered by the court at the time of sentencing on the four armed robbery counts.

The facts and circumstances dealing with Cheers' arrest at 2479 West Fond du Lac Avenue and the armed robberies of the three persons at 3300 West Lisbon Avenue are as follows:

On December 13, 1978, between 4 and 5 p.m. Marilyn Sue Netterville, Lornell Reid and his brother, David Reid were in the kitchen of Netterville's residence at 3300 West Lisbon Avenue, Milwaukee, when three black

in granting the defendants' motion to by-pass the court of appeals even though the state's waiver claim is meritorious. We are cognizant of the general rule "that failure to object to a jury instruction in a timely fashion constitutes a waiver of the objection," (citations omitted) *State v. Baldwin,* 101 Wis.2d 441, 304 N.W.2d 742 (1981), but this rule "is not inflexible and admits of exceptions in cases of 'compelling circumstances.'" *Brown v. State,* 59 Wis.2d 200, 214, 207 N.W.2d 602 (1973). This court has held that challenges to jury instructions which raise state and federal constitutional questions relative to the state's burden of proof beyond a reasonable doubt and a defendant's right to a unanimous verdict are of a sufficiently compelling nature to warrant this court's attention on appeal despite the defendants' waiver of the right to raise the claim by failure to make a timely objection. *State v. Baldwin, supra* at 446; *Manson v. State,* 101 Wis.2d 413, n. 2 at 417, 304 N.W.2d 729 (1981).

men entered the room through the back door and, at gunpoint, robbed them after ordering them to lie down on the floor and tying their hands and feet. The robbers entered the home within seconds of each other; the first to enter (identified as Cheers) had a sawed-off shotgun up his coat sleeve and, after letting the shotgun slide out of his sleeve and into his hand, informed Netterville and the Reid brothers of a holdup. The second assailant following Cheers through the door was armed with a handgun and the third robber (Crockett) was armed with a revolver. Once the victims were tied, the three intruders searched the victims and removed their valuables, including cash and jewelry. While the victims were being searched, Cheers threatened Lornell Reid, stating "[I] should blow your brains out." The assailants then emptied Netterville's purse and left the home taking the property they had removed from the victims as well as a twelve-gauge shotgun belonging to Lornell Reid (stored at Nettervilles).

After the armed robbery, the victims reported the incident to the police and gave descriptions of their assailants. At the preliminary examination, Netterville testified that she had described the robbers as to their respective weights and heights to the police, stating that one was sort of tall and the other two were 5' 2" and that all three intruders were black with one wearing a gold saggy hat and another wearing glasses. Netterville was able to identify the defendant Crockett, but unable to identify Cheers.

At the preliminary hearing, Lornell Reid identified Cheers as the first robber to enter the kitchen and during cross-examination by Cheers' counsel testified that he told the police the first man into the house ". . . was wearing a heavy coat. . . . [and] had on a flop cap." At trial, on cross-examination by Cheers' attorney, Lornell gave a more particularized account of the way in

which he described Cheers to the police. He reiterated his description of the clothes Cheers was wearing, adding that the coat was a "long" coat, and went on to state that he told the police the first robber to enter the kitchen was "five feet some" (he couldn't recall the exact height he told the police). He further testified that he got a good look at Cheers' head and face on the day of the robbery, and was subsequently able to identify Cheers at the lineup on December 20, 1978, by his face, stating "I knowed him when I saw him." Lornell Reid was able to identify Cheers but unable to identify Crockett.

David Reid also recited that he gave a description of the robbers to the police. At the preliminary, David stated he told the police "what they [the assailants] looked like. . . ." At trial, Cheers' attorney asked David to describe what Cheers was wearing on the day of the robbery and he replied, a brown looking quarter length coat and a "sort of dark looking cap" that was "flopped down." David identified both defendants, Cheers and Crockett, as two of the perpetrators of the armed robberies at the preliminary examination and at trial, but identified Cheers only at the lineup.

The record also reflects that Ronnie Reid, the ten-year old son of David Reid, was present in the Netterville home at the time of the robbery and was interviewed by the police after the incident. At trial, Ronnie identified both Cheers and Crockett as two of the three robbers.

On December 19, 1978, after the photographic identification of Crockett, a warrant was issued for his arrest. A few hours later, at about 8 p.m., Officer Dieter Kraemer and other members of the Milwaukee Police Department were dispatched to the 2479 West Fond du Lac Avenue address to investigate persons suspected

of being involved in the robberies at 3300 West Lisbon Avenue and 3250 North 9th Street.

Officer Kraemer, testifying at the suppression hearings[8] and trial revealed the following sequence of events that led to Cheers' arrest around 8 p.m. on December 19, 1978. Prior to being directed to go to the West Fond du Lac Avenue address, Kraemer testified he had knowledge of the warrant for Crockett's arrest and was "aware of the description of the possible suspects in . . ." the robberies at 3300 West Lisbon Avenue and 3250 North 9th Street. Further, Kraemer related he proceeded to the West Fond du Lac Avenue address after he received information at roll call and from his partner (Glenn Frankovis) that Crockett was staying there and further that he should be on the lookout for Crockett and other persons who fit the descriptions of the suspects wanted in the West Lisbon Avenue and North 9th Street armed robberies. Officer Kraemer stated, "I was looking for three suspects that were wanted in two robberies and in particular a suspect by the name of Claven Crockett," and that "I suspected that there might be two other accomplices with him [Crockett]."

Upon arriving at 2479 West Fond du Lac Avenue, Kraemer observed that all of the windows except one on the second floor were boarded up. Shortly thereafter, he saw a black man (later identified as Cheers) approaching the back door of the residence from an alleyway and noted that the man "matched the description of one of the holdup suspects from the robbery at 3250 North 9th Street on the 15th of December." When asked to detail how Cheers fit the description of one of

---

[8] The circuit court held separate hearings on the defendant Cheers' motion that his arrest was illegal and another on the defendant Crockett's motion to suppress the physical evidence seized at the house at the time of his arrest.

the robbery suspects, Kraemer said "The age, height, weight and the complexion of the—of Mr. Cheers." On cross-examination, Cheers' counsel further pursued the matter of how Cheers matched the description of one of the robbers, asking the following questions and eliciting the following answers:

"*Q.* And you indicated that the previous description that you had of one of the parties in the armed robbery, you indicated he fit the description because of age, height, weight and complexion? *A.* That's correct.
"*Q.* In other words, the complexion part of this, he was black? *A.* No.
"*Q.* What complexion attitude did he fit of what was publicized to you on December 15th? [the robbery at 3250 North 9th Street]. *A.* Well, that he was medium complected [black] and that he had a bumpy face.
"*Q.* And you had never seen Mr. Cheers before, had you? *A.* No, I had not.
"*Q.* How was he dressed? *A.* He was dressed in a full-length brownish leather coat and the rest I don't recall."

As noted, according to Kraemer's testimony, his attention was drawn to the man approaching the residence from the alley (Cheers) because he matched the description of one of the robbery suspects, so he called to him and asked him to stop, stating that he wanted to talk to him about the occupants of the house. Kraemer observed Cheers looking at him but stated that he (Cheers) failed to respond and in fact increased his "gait" toward the rear door of the house. Thereupon, Kraemer ran toward Cheers but was unable to reach him before Cheers had climbed the back steps and was attempting to gain entry to the house by knocking on the rear door and hollering to the occupants. At that point, Kraemer again called to Cheers and Cheers thrust his left hand into his left coat pocket. This action prompted Kraemer, for his own safety, to

order Cheers to freeze. Kraemer then ascended the steps toward Cheers at which time he noted that the door had been opened in response to Cheers' knocking and hollering, and, upon looking through the outer and interior doors, observed Crockett, whom he recognized from a past contact (he had arrested him for carrying a concealed weapon some two months earlier in October of 1978), standing in the kitchen area of the residence some seven to nine feet away. After the door was slammed shut, Kraemer escorted Cheers down the steps, patted him down and found a pocket knife of between three and three and one-half inches in length in his left coat pocket. Kraemer then arrested Cheers for carrying a concealed weapon and handcuffed him with his arms secured around a fence pole. Kraemer and the other officers were subsequently permitted to enter the house by an occupant named R. L. Ward and, after a thorough search of the house, arrested Crockett, *hiding in the attic.*[9]

Cheers, Crockett and four other black males found in the home were taken into custody and, as previously noted, placed in a lineup the following day. The Milwaukee Police Department show-up report for December 20, 1978, recites that Cheers was arrested for armed robbery and carrying a concealed weapon. Cheers was not prosecuted for the offense of carrying a concealed weapon as he was prosecuted for the armed robbery crimes.

Portions of Kraemer's testimony were disputed by Cheers and Crockett. At the hearing on his motion to suppress his lineup and court identifications, Cheers testified that, when he was walking toward the rear door of 2479 West Fond du Lac Avenue, he heard a person call "Hey" and as he turned around he saw sev-

---

[9] Crockett was arrested pursuant to the warrant.

eral officers approaching him carrying twelve gauge shotguns. He then proceeded to the rear door and fell back down the steps while attempting to get into the house. He stated that three or four officers then picked him up at the foot of the stairs, put him against a fence and "went through" his pockets, removing a two and one-half to three-inch pocket knife from his right coat pocket. He further testified that the officers did not tell him he was under arrest at that time but advised him of his arrest at the police station.

Crockett and Linda Metcalf, a female occupant of the premises at the time of Crockett's arrest (West Fond du Lac Avenue), testified at a suppression hearing[10] that Crockett was not present in the kitchen at the time of Cheers' apprehension. Crockett also challenged Kraemer's testimony, stating that it was impossible for a person standing outside the house to see into the kitchen regardless of whether both the kitchen and outside doors were open for, "One door is at right angles [sic] to the other one and one opens in such a way, [that] when the other one opens, you can't see into the kitchen."

*Issues*

1. Did the police officers have probable cause to arrest Cheers at the time they handcuffed him to the fence pole, and, if not, did the trial court have personal jurisdiction over Cheers?

2. Did the trial court commit error when it failed to suppress Cheers' lineup and in-court identifications on the theory that they were fruits of an illegal arrest?

---

[10] As previously noted there were two suppression hearings in the circuit court; one on Cheers' motion to suppress his out-of-court lineup identification and the other on Crockett's motion to suppress the physical evidence (shotgun) retrieved from the attic of the house at 2479 West Fond du Lac Avenue. Crockett and Metcalf only testified at the latter suppression hearing.

3. Did the trial court deprive the defendants of their constitutional rights to a unanimous jury verdict[11] and relieve the prosecution of the requirement of proving every element of the crime charged beyond a reasonable doubt[12] when it instructed the jury that it could find the defendants guilty of armed robbery if it found that the defendants either used or threatened the use of force against their victims?

4. Did the trial court's armed robbery instruction permit the jury to convict the defendants of a crime they were not charged with, thereby depriving them of their right to notice and an opportunity to defend in violation of the due process clause in the Fourteenth Amendment to the United States Constitution and Wis. Const. art. I, secs. 7 and 8?

I. *Probable Cause to Arrest*

Cheers claims that the information possessed by the Milwaukee Police Department and Officer Kraemer at the time of his arrest was insufficient to establish probable cause to arrest him for the armed robberies. Specificially, Cheers asserts that the information possessed by Kraemer and the police department at the time of his arrest was insufficient to support a determination of probable cause to arrest because: (1) Kraemer's testimony as to Cheers' description was too general; and (2) "assuming this court could find that

---

[11] Wis. Const., art. I, secs. 5 and 7 guarantee defendants the right to trial by jury and this court has held that that right includes the right to a unanimous verdict. *See: Holland v. State,* 91 Wis.2d 134, 138, 280 N.W.2d 288 (1979).

[12] The due process clause in the Fourteenth Amendment to the Federal Constitution prohibits conviction "except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime . . . charged." *In re Winship,* 397 U.S. 358, 364 (1970). *See also: Turner v. State,* 76 Wis.2d 1, 16, 250 N.W.2d 706 (1977).

[Cheers] 'matched' a description of the suspect," there was "no showing as to what [descriptive information] was possessed [by the police department] and whether the information was accurate or otherwise reliable."[13]

The requirement of probable cause for a warrantless arrest was described by this court in *State v. Paszek,* 50 Wis.2d 619, 624–25, 184 N.W.2d 836 (1971), as follows:

"Probable cause to arrest refers to that quantum of evidence which would lead a reasonable police officer to believe that the defendant probably committed a crime. *Henry v. United States* (1959), 361 U.S. 98, 102, 80 Sup. Ct. 168, 4 L. Ed.2d 134. It is not necessary that the evidence giving rise to such probable cause be sufficient to prove guilt beyond a reasonable doubt, nor must it be sufficient to prove that guilt is more probable than not. It is only necessary that the information lead a reasonable officer to believe that guilt is more than a possibility, *Browne v. State, supra,* and it is well established that the belief may be predicated in part upon hearsay information. *Draper v. United States* (1959), 358 U.S. 307, 79 Sup. Ct. 329, 3 L. Ed.2d 327. The quantum of information which constitutes probable cause to arrest must be measured by the facts of the particular case. *Wong Sun v. United States* (1963), 371 U.S. 471, 83 Sup. Ct. 407, 9 L. Ed.2d 441. Probable

---

[13] Cheers also claims that his association with the house at 2479 West Fond du Lac Avenue is irrelevant because there was no showing that the officers knew Crockett lived there prior to his (Cheers') arrest. This claim is unfounded for, as previously noted, Kraemer testified (during the hearing on Crockett's motion to suppress physical evidence taken from the house) that he personally had knowledge that Crockett lived there and suspected that his accomplices (Cheers and others) could be found in the area. This information was subsequently corroborated when Kraemer personally observed Cheers approaching the West Fond du Lac Avenue residence and further observed Crockett in the kitchen when the doors were opened to let Cheers in. The record is clear that this occurred prior to Cheers' arrest.

cause is defined in *Draper v. United States, supra,* p. 313, as:

" ' "In dealing with probable cause, . . . as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians act." *Brinegar v. United States, supra,* at 175 [ (1949), 338 U.S. 160, 69 Sup. Ct. 1302, 93 L. Ed. 1879]. Probable cause exists where "the facts and circumstances within [the arresting officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that" an offense has been or is being committed. *Carroll v. United States,* 267 U.S. 132, 162.' "

This court has also held that a finding of "[p]robable cause for an arrest is less than that required for a bindover . . ." *State v. Williams,* 47 Wis.2d 242, 248, 177 N.W.2d 611 (1970). *See also: Hills v. State,* 93 Wis.2d 139, 145, 286 N.W.2d 356 (1980).

As recognized by the Supreme Court of the United States in *Brinegar v. United States,* 338 U.S. 160, 176 (1949), the probable cause requirement for an arrest or search serves:

". . . to safeguard citizens from rash and unreasonable interferences with privacy and from unfounded charges of crime. [It] also seek[s] to give fair leeway for enforcing the law in the community's protection. Because many situations which confront officers in the course of executing their duties are more or less ambiguous, room must be allowed for some mistakes on their part. But the mistakes must be those of reasonable men, acting on facts leading sensibly to their conclusions of probability. The rule of probable cause is a practical, nontechnical conception affording the best compromise that has been found for accommodating these often opposing interests. Requiring more would unduly hamper law enforcement. To allow less would be to leave law-

abiding citizens at the mercy of the officers' whim or caprice."[14]

When an arrest is made without a warrant, the state bears the burden of showing the existence of probable cause. *Leroux v. State,* 58 Wis.2d 671, 682, 207 N.W.2d 589 (1973). The standard by which the arresting officer's conduct is to be measured is objective, not subjective, *Browne v. State,* 24 Wis.2d 491, 503, 129 N.W.2d 175, 131 N.W.2d 169 (1964), *cert. den.* 379 U.S. 1004, and this court is obliged to consider the totality of the circumstances, thus all of the facts available to the police *at the time of the arrest* in ascertaining whether the officers had probable cause to effect a valid arrest. *See: United States ex rel. LaBelle v. LaValle,* 517 F.2d 750, 753–54 (2d Cir. 1975); *Hills v. State, supra* at 147–48; *State v. Doyle,* 96 Wis.2d 272, 286–88, 291 N.W.2d 545 (1980). *See also: Penister v. State,* 74 Wis.2d 94, 246 N.W.2d 115 (1976). Accordingly, where an arresting officer is given information through police channels such as roll call, this court's assessment of whether the arrest was supported by probable cause is to be made on the collective knowledge of the police force. This principle was explained in *Schaffer v. State,* 75 Wis.2d 673, 676–77, 250 N.W.2d 326 (1977), as follows:

[14] *See also: Hills v. State,* 93 Wis.2d 139, 144, 286 N.W.2d 356 (1980):

"The requirement that arrests be based upon probable cause serves as a safeguard to protect citizens from rash and unreasonable interference with their privacy and from unfounded charges of crime. At the same time it also gives fair leeway to the state for enforcing the law for the protection of the public. 'The rule of probable cause is a practical, nontechnical conception affording the best compromise that has been found for accommodating these often opposing interests.' *Brinegar v. United States,* 338 U.S. 160, 176 (1949)."

"An arresting officer may rely on all collective information in the police department, and, acting in good faith on the basis of such information, may assume at the time of apprehension that probable cause has been established. *State v. Mabra,* 61 Wis.2d 613, 625, 213 N.W.2d 545, 551 (1974) ; *State v. Taylor,* 60 Wis.2d 506, 515, 210 N.W.2d 873, 878 (1973). Thus, an officer, such as Vande Berge here, who in good faith relies upon such collective information, is legally justified to make an arrest.

"Such legal justification, however, cannot alone constitute probable cause for such an arrest, for it is necessary that the officer's underlying assumption of probable cause be correct. *State v. Taylor, supra* at 515–16, 210 N.W.2d at 878. Where an officer relies upon a police communication in making an arrest, in the absence of his personal knowledge of probable cause, the arrest will only be based on probable cause, and thus valid, when such facts exist within the police department. *Desjarlais v. State,* 73 Wis.2d 480, 491, 243 N.W.2d 453, 459 (1976) ; *State v. Shears,* 68 Wis.2d 217, 253, 229 N.W.2d 103, 121 (1975) ; *State v. Mabra, supra* at 625, 213 N.W.2d at 551; *State v. Taylor, supra* at 515–16, 210 N.W.2d at 878." *See also: Whitley v. Warden,* 401 U.S. 560 (1971).

■ The undisputed testimony of Officer Kraemer establishes he was directed to go to 2479 West Fond du Lac Avenue for the purpose of investigating the robberies at both 3300 West Lisbon Avenue and 3250 North 9th Street as he had been informed by both the police department (at roll call) and his partner that a suspect who had been positively identified by the victims of those robberies (Crockett) and for whom an arrest warrant had been issued was staying there. At that time, Kraemer had knowledge and was "aware" of the descriptions of Crockett's accomplices in the robberies at 3300 West Lisbon Avenue and 3250 North 9th Street, and was told and suspected that they might be with Crockett that evening. Shortly after Kraemer arrived

at the residence where Crockett was known to be staying, he saw a black man (Cheers) walking from an alleyway toward the back door of the home, and from twenty to twenty-five feet away, observed that the man matched the description of one of Crockett's accomplices in the North 9th Street armed robbery as to age, weight, height and complexion. The record demonstrates that after the West Lisbon Avenue robberies, the victims conveyed various specifics of Cheers' descriptive characteristics to the police, including his height as "five feet some," or at least 5′ 2″, his complexion as "medium" with a pockmarked (bumpy) face, and that he wore a "flop cap" and "long" coat at the time of the robbery. Kraemer's testimony is unrefuted that Cheers fit the descriptive characteristics of age and weight, as well as the specified descriptive characteristic regarding complexion—black and medium complected with a pockmarked face, and height—over five feet, and his testimony that at the time of his arrest Cheers was wearing a "full-length" coat. Further, since one of the reasons for the trial court's conclusion that Officer Kraemer had probable cause to arrest was that Cheers "met the description of a person who had participated in the armed robbery," it is evident that the judge, present in the courtroom, determined through first-hand observation that Cheers matched the description to his satisfaction including his complexion (medium complected and "bumpy" face) recited in Kraemer's testimony, and thus the trial court's finding in this regard is to be accepted by this court as it is not against the great weight and clear preponderance of the evidence. *Hills v. State, supra* at 146.

In addition, it is undisputed that, at the time Kraemer initially observed Cheers and called to him, Cheers—recognizing Kraemer and his fellow officers as police-

men and that some of them were carrying .12-gauge shotguns—turned away, quickened his pace toward the house, and proceeded to "holler" to the occupants while knocking on the door in an attempt to gain immediate entry.[15] Cheers' conduct and retreat or "flight" from the police officers' show of authority immediately prior to the time of his arrest certainly constitutes evidence of consciousness of guilt and, therefore, "is a factor to be considered in determining whether probable cause exists." (Citations omitted.) *United States v. Gomez,* 633 F.2d 999 (2d Cir. 1980). As stated in *Sibron v. New York,* 392 U.S. 40, 66 (1968):

". . . deliberately furtive actions and flight at the approach of strangers or law officers are strong indicia of *mens rea,* and when coupled with specific knowledge on

---

[15] Cheers recounted this incident during examination by his counsel as follows:

"*Q.* And as you approached the 2479 address, did anybody call out to you or anything like that? *A.* The officer called me, yeah.

"*Q.* And what did this officer say to you, Mr. Cheers? *A.* He just called me. He just said, 'Hey.'

"*Q.* And what happened after the officer said, 'Hey'? *A.* I turned around.

"*Q.* And after you turned around, what did you observe? *A.* Police officers.

"*Q.* And how close to you were these police officers? *A.* A good 20–25 feet.

"*Q.* And how did they approach you at this time? *A.* They approached me with weapons and—facing at me.

"*Q.* They approached you with drawn weapons? *A.* Yes, pumps.

". . .

"*Q.* Is that a type of rifle? *A.* Twelve gauge.

"*Q.* Twelve gauge shotgun. And at this point in time, what did you do? *A.* I couldn't do nothing but holler and knock on the door.

"*Q.* You were trying to get into the house while these police officers were out there? *A.* Well, I didn't know what they were going to do to me."

the part of the officer relating the suspect to the evidence of crime, they are proper factors to be considered in the decision to make an arrest. *Brinegar v. United States,* 338 U.S. 160 (1949) ; *Husty v. United States,* 282 U.S. 694 (1931) ; see *Henry v. United States,* 361 U.S. 98, 103 (1959)."[16]

Further, Kraemer's testimony that Cheers "thrust" his left hand into his left-coat pocket when Kraemer called to him a second time, is also undisputed.[17] Under the circumstances then present, *i.e.,* pursuit by a number of police officers, Cheers' action in thrusting his hand into his coat pocket may be viewed as "threatening" and thus is further indicia of *mens rea* and an additional factor which may properly be considered in assessing whether Cheers' arrest was lawful. *Sibron, supra. See: State v. Halstead,* 414 A.2d 1138, 1149 (R.I. 1980).

Moreover, Kraemer testified that the officers' information led them to suspect that Crockett's accomplices, including Cheers, would be in the area and in fact were found in close proximity to Crockett as Kraemer recited that at the time he reached Cheers, both the back door of the residence as well as the door leading to the kitchen were open, and he was able to see the defendant Crockett standing in the kitchen some seven to eight feet away. Recognizing that Kraemer, as a police officer, is trained to make instant observations of this nature and that

[16] This court has recognized this principle on previous occasions stating that, although flight alone may be insufficient to establish probable cause, "flight may be conclusive when viewed in connection with other factors." *State v. DiMaggio,* 49 Wis.2d 565, 574, 182 N.W.2d 466 (1971) ; *State v. Shears,* 68 Wis.2d 217, 250, 229 N.W.2d 103 (1975).

[17] Cheers never denied that he thrust his left hand into his left-coat pocket; rather, he only refuted Kraemer's testimony that the pocket knife was found in his left pocket, claiming that it was in his right.

Kraemer was knowledgeable of Crockett's appearance as he had personally arrested him some two months earlier in October of 1978, we conclude that Kraemer's knowledge of Crockett's presence in the kitchen (although disputed) in addition to the information previously referred to, may properly be taken into consideration when assessing whether the arresting officer (Kraemer), had probable cause to arrest Cheers. Accordingly, considering the relevant and suspicious circumstances, including (1) the officers' awareness of the descriptions of the suspects, Crockett and his accomplices, one matching Cheers' features; (2) their (officers) suspicion that the suspects would be at or in the vicinity of the West Fond du Lac Avenue address; and (3) Cheers' "flight" toward and desperate (knocking and hollering) attempt to gain immediate entry to a house where an identified suspect (Crockett) was known to be staying, we conclude that Kraemer's *pre-arrest* observation that this house was presently occupied by Crockett, a known suspect in the robberies Kraemer was investigating that proved to be accurate when the officers subsequently entered the residence establishes that before arresting Cheers, Kraemer had reliable information of the existence of a link between Cheers and Crockett. Kraemer's observation of Crockett in the house also corroborates the information Kraemer received from the police department (at roll call) prior to the arrest that Crockett was known to be staying at this residence. Further, Cheers never denied association with Crockett or the house occupied by him and in fact testified at the hearing on the validity of the arrest that he was associated with that residence, as well as its occupants, stating that he and his friends used it as a ministry. While mere association with one suspected of criminal activity does not, without more, give to probable cause to arrest, *United States v. Di Re,* 332

U.S. 581, 593 (1948); *United States v. Rosario,* 543 F.2d 6 (2d Cir. 1976); *Pritz v. Hackett,* 440 F. Supp. 592, 597 (W.D. Wis. 1977), it does lend corroborative information to knowledge already in the possession of the police. *See: Rosario, supra*; and *United States v. Irurzun,* 631 F.2d 60, 63 (5th Cir. 1980).

We disagree with Cheers' claim that the description possessed by the police as to the suspect's height (5′ 2″ or over), weight, age, complexion (black, medium complected-pockmarked face) and clothes worn on the night of the 3300 West Lisbon Avenue robberies ("long," "heavy" coat) was of itself insufficient to support a finding of probable cause to arrest. However, we need not discuss this issue as we agree with the judge presiding at Cheers' suppression hearing that the descriptions, together with the totality of information possessed by the officers at the time of Cheers' arrest including Cheers' suspicious behavior when confronted by the officers ("flight" to the house where Crockett was known to be staying, boisterous attempt to gain entry and threatening movement in thrusting his hand into his coat pocket) and his demonstrated association with Crockett as well as the residence harboring him, establish that the arrest was valid.

The record demonstrates that the description relied upon by Kraemer was information communicated to him as part of the collective knowledge of the police department concerning the armed robberies. The defendant recognizes that an arresting officer may rely on the "collective information" of the police department, *Schaffer v. State, supra* at 676–77, but contends that the state must establish that the information channeled to the arresting officer came from a reliable source and was gained in a reliable manner. In essence, Cheers contends that the "collective information" of the police department, like all other hearsay information used to demon-

strate probable cause, must meet the two-pronged test for assessing the trustworthiness of such hearsay set forth in *Aguilar v. Texas*, 378 U.S. 108 (1964). As explained in *State v. Paszek, supra* at 627, *Aguilar* requires that the officer must establish:

"(1) The underlying circumstances from which he concludes that the informant is reliable; and (2) that the underlying circumstances or manner in which the informant obtained his information is reliable."

The record in this case demonstrates that the description on which Kraemer relied was communicated to him at roll call on December 15, 1978, the day of the robbery at 3250 North 9th Street. The victims of that robbery, Edna Ward and Richard Nicksion, reported that crime and the descriptions to the police and subsequently identified both Cheers and Crockett at the lineup and preliminary examination. Kraemer's testimony clearly indicates that the description he relied upon was in fact given to the police department by the robbery victims. Additionally, it is to be noted that the victims of the robberies at 3300 West Lisbon Avenue, Netterville, Lornell Reid and David Reid, also testified to giving descriptions of their assailants to the police immediately after the robbery and Kraemer recited that he was aware of such descriptions before Cheers' arrest.

In *Paszek, supra* at 631, this court, quoting from *People v. Bevins*, 6 Cal. App.3d 421, 85 Cal. Rptr. 876 (1970), stated:

" '. . . We note, initially, that a valid arrest without a warrant may be made solely by reason of information communicated by a reliable informant. [Citations omitted.] *A citizen who purports to be a victim of or to have witnessed a crime is a reliable informant even though his reliability has not theretofore been proved or tested.* [Citations omitted.] The rationale underlying this principle is that such a person, as the observer of criminal activi-

ty, acts openly in aid of law enforcement when he reports the crime to the police. [Citations omitted.]' " (Emphasis added.)

Thus, the five crime victims, Ward, Nicksion, Netterville and Lornell and David Reid, are considered to be reliable informants and therefore meet the first prong of the *Aguilar* test. However, as stated in *State v. Doyle, supra* at 287:

". . . there must be some type of evaluation of the reliability of victim and witness informants, although the standard to be applied is much less stringent:

" ' "[T]he reliability of such a person should be evaluated from the nature of his report, his opportunity to hear and see the matters reported, and the extent to which it can be verified by independent police investigation." . . . However, there must be some safeguard, and this can be satisfied by verification of some of the details of the information reported, but it need not be to the same degree as required in evaluating the "tips" of a police informer.

" 'Essentially, the search for reliability in the case of a citizen informer is shifted to the second prong of the *Aguilar* test, *i.e.*, from personal reliability to "observational" reliability.' *State v. Knudson, supra* at 277. *See also: Allison v. State*, 62 Wis.2d 14, 214 N.W.2d 437 (1974), and *State v. Marshall, supra.*"

Officer Kraemer's testimony establishes that he relied upon the collective information of the police department as he was aware of the descriptions supplied by the victims of the robberies. Four of these victims, Ward, Nicksion and Lornell and David Reid obviously had a sufficient opportunity to see Cheers as they all identified him as one of the assailants at the police lineup and again at the preliminary examination. Lornell Reid expressly recited that he was able to identify Cheers by his face, stating that he got a good look at Cheers' face on the night of the robberies, and, in reference to the lineup

identification, recited "I knowed him when I saw him," and "I identified his face." Further, the victims' description was subsequently verified when Kraemer observed that a man (Cheers) approaching a house he was directed to investigate and where Crockett was known to be staying, "matched" that description. Therefore, in light of the fact that the description testified to by Lornell and David Reid and the description attributed to Ward and Nicksion was based upon their personal observation, we hold that the reliability of the description was established, and thus the second prong of the *Aguilar* test is satisfied.

In assessing the existence of probable cause to arrest, we must take into consideration all of the facts known to the police at the time of the arrest. The facts channelled to the arresting officers as part of the collective information of the police department and those observed by the arresting officers at the time of Cheers' arrest included: (1) the information obtained at roll call that Crockett was residing in the residence at 2479 West Fond du Lac Avenue; (2) the officers' knowledge that there were three black participants in the armed robberies they were investigating and their suspicion that Crockett's accomplices would be in his company; (3) the officers' awareness of the descriptions of Crockett's accomplices; (4) Kraemer's observation that Cheers matched a description of one of the suspects (black-medium complexion, pockmarked face, age, height and weight, "long" or "full-length" coat) ; (5) Cheers' suspicious behavior in fleeing or retreating from the officers' show of authority, boisterous and desperate attempt to gain immediate entry into a house where an identified suspect (Crockett) was known to be staying and threatening action in thrusting his hand into a pock-

et; and (6) demonstrated association with a man identified as one of the three robbers (Crockett). Considering the aggregate of all the information in the police department and arresting officer's possession, together with the fact that it was obtained from reliable sources and by reliable methods, we agree with the finding of the trial judge who heard Cheers' motion to suppress, and upon application of the relevant case law previously recited, conclude that at the time of Cheers' arrest, Kraemer and his fellow officers could have reasonably believed that Cheers' guilt was far more than a possibility. Thus, we hold that the officers had probable cause to arrest Cheers for armed robbery.[18] Our holding that Cheers' arrest was lawful disposes of the claims that the trial court lacked personal jurisdiction and that the court erred in failing to suppress Cheers' out-of-court and in-court identifications, as both claims were premised on the contention that Cheers' arrest was without probable cause.

## II. *Unanimous Verdict*

The defendants, Cheers and Crockett, contend that the trial court's disjunctive armed robbery instruction providing that they could be found guilty of the crime of armed robbery if they either used *or* threatened the imminent use of force violates their constitutional right to a unanimous jury verdict and relieved the state of the due process requirement of proving each essential element of the crime beyond a reasonable doubt.[19]

---

[18] Having concluded that the arresting officers had probable cause to arrest Cheers for armed robbery, we need not address the question of whether Kraemer had probable cause to arrest Cheers for carrying a concealed weapon.

[19] This court has recognized the link between the unanimity requirement and the reasonable doubt standard stating that these constitutional principles require:

The essence of the defendants' claim is that the disjunctive armed robbery instruction permitted the jury to arrive at a guilty verdict without necessarily agreeing whether the crime was committed with the use of force or with a threat of the imminent use of force. In support of their claim, the defendants argue that: (1) the robbery statute, sec. 943.32(1), Stats., creates two distinct crimes, robbery "[b]y force against the person of the owner with intent to thereby overcome his physical resistance or physical power of resistance to the taking or carrying away of the property," (sec. 943.32(1)(a), Stats.), and robbery "[b]y threatening the imminent use of force against the person of the owner . . . with intent thereby to compel the owner to acquiesce in the taking or carrying away of the property (Sec. 943.32(1)(b), Stats.);" and (2) the use of force and the threat of imminent use of force are conceptually distinguishable and therefore under *United States v. Gipson,* 553 F.2d 453 (5th Cir. 1977) the jury must unanimously agree as to either the presence of use of force or the presence of a threat of imminent use of force. We reaffirm our recent decisions in *State v. Baldwin,* 101 Wis.2d 441, 304 N.W. 2d 742 (1981), and *Manson v. State,* 101 Wis.2d 413, 304 N.W.2d 729 (1981), that dictate the rejection of the defendants' claims.

In *Manson, supra,* this court was presented with the same arguments and the court held that the determination of whether or not sec. 943.32(1), Stats., defines a single crime or two separate crimes is dependent on legislative intent. After a thorough review of the various criteria relevant to this determination, including the lan-

"... that the jury must agree unanimously that the prosecutor has proved each essential element of the offense beyond a reasonable doubt before a valid verdict of guilty can be returned." *Holland v. State,* 91 Wis.2d 134, 138, 280 N.W.2d 288 (1979).

guage of the statute, the legislative history and context of the statute, the nature of the proscribed conduct and the appropriateness of multiple punishment for the conduct, this court further held that sec. 943.32 (1) delineates but one crime that may be committed by either using or threatening the imminent use of force. *Manson, supra,* at p. 428.

Once it is determined that one crime with alternative means of establishing the force element was intended, the question becomes whether, for the purposes of imposing criminal liability under sec. 943.32 (1) and (2), Stats., use of force and threat of force "are of sufficient conceptual similarity to comprise but a single element of the offense . . ." *Baldwin, supra,* at 450. If so, then the requirement of jury unanimity is satisfied so long as all of the members of the jury agree that force—actual or threatened—was present in the commission of the crime. *Id.*

The defendants contend that there exists a conceptual distinction between the use of force and the threat of imminent use of force and therefore under *Gipson, supra,* unanimity as to one or the other was required. This claim was specifically rejected by this court in *Manson, supra* in the following language:

". . . Force and threat of imminent use of force comprise one conceptual grouping under the 'conceptual grouping' doctrine set forth in *Gipson. State v. Baldwin,* 101 Wis.2d 441, 450, 304 N.W.2d 742 (1981). The essence of the offense of robbery is compelling the owner to part with his property under compulsion resulting from defendant's conduct directed against the person of the owner or against another who is in the owner's presence.

"The court concludes that requiring the jurors to decide whether the taking was accomplished by 'using force against the person of the owner with intent thereby to overcome his physical resistance or physical power of resistance to the taking or carrying away of the prop-

erty,' sec. 943.32(1)(a), Stats. 1979–80, or 'by threatening the imminent use of force against the person of the owner or of another who is present with intent thereby to compel the owner to acquiesce in the taking or carrying away of the property,' sec. 943.32(1)(a), would raise characterization problems which the courts in *Gipson* and in *Holland* correctly noted should be avoided. The jury should not be instructed to draw a line finer than that which the human conduct sought to be defined will realistically permit. The jury should not be obliged to decide between two statutorily prohibited ways of committing the crime if the two ways are practically indistinguishable." *Supra,* at 430.

The foregoing reasoning was alternatively stated in *Baldwin, supra* as follows:

". . . There can be little doubt that, as the defendant states, the threat of a beating is distinguishable from the beating itself. But the element of compulsion, the utter subjugation of the victim's free will, is no different in character if it results from the raised fist or the first blow. Moreover, it is not difficult to imagine where the line between 'threat' and 'use' blurs, even where a jury may be in agreement as to precisely what a defendant did. The proper application of the *Gipson* rationale is not dependent upon the conceptual dissimilarity, but rather the conceptual similarity of the conduct. In *Holland* we said '[t]he *Gipson* logic requires the jury to agree on the factual theory or "concept" underlying criminal liability but does not require it to split hairs over nomenclature.' 91 Wis.2d at 139." *Supra,* at 450.

As stated in *Manson, supra,* n. 7 at 431, "robbery is a single offense which may be committed by alternative methods," and thus, the reference to the use of force in sec. 943.32(1)(a), Stats., and the reference to the threat of imminent use of force in sec. 943.32(1)(b), refer to but an element of the crime of robbery—force. Hence, under *Baldwin* and *Manson,* the jury was not required to be instructed to agree on the specific manner

in which the defendants exerted force against their victims. All that was required was unanimity as to the presence of force—actual or threatened—and that force in whatever form was employed to compel the victims to surrender their property without their consent. A contrary conclusion could readily lead to jury confusion and consternation on the issue of the presence of the element of force making the prospect of hung juries in robbery cases more likely and thereby frustrating the ends of justice, for, as noted in *Baldwin, supra,* at 450, it is not difficult to envision a situation where the line between "threat" and "use" of force would be unclear "even where a jury may be in agreement as to precisely what a defendant did." Therefore, we hold that the trial court's armed robbery instruction, insofar as it required the jury to find force—whether actual or threatened—neither deprived the defendants of their right to a unanimous verdict nor relieved the state of the burden of proving every element of the crime charged beyond a reasonable doubt.

### III. *Notice and Opportunity to Defend*

The defendants' final contention on appeal is that the trial court's armed robbery jury instruction permitted the jury to convict the defendants of a crime they were not charged with thereby depriving them of their right to notice and an opportunity to defend in violation of the due process clause in the Fourteenth Amendment to the United States Constitution and Wis. Const., art. I, secs. 7 and 8. They base this contention on the fact that the three counts of armed robbery tried to the jury recited that the defendants were charged with the commission of armed robbery while *using* force, contrary to sec. 943.32 (1) (a) and (2), Stats. 1977, whereas the court's instructions permitted the jury to convict them if it found that they committed the offense while either using force *or threatening the imminent use of force.*

The three counts of armed robbery tried to the jury were identical except for the named victim. Count one typifies the charges preferred in the first three counts and reads:

"COUNT #1 ARMED ROBBERY (PTAC)
"On 12/13/78 at 3300 West Lisbon Ave., City of Milwaukee, as party to a crime, with intent to steal, did take property from the person of Marilyn Sue Netterville, the owner, by using force against the person of the owner, Marilyn Sue Netterville, and while armed with dangerous weapons, to wit: shotgun and handguns, with intent thereby to overcome the said owner's physical resistance or physical power of resistance to the taking and carrying away of said property, contrary to Wisconsin Statutes sections 943.32(1) (a) and (2) and 939.05."

The procedural due process requirements of the Wisconsin Constitution, art. I, sec. 7 and the Sixth Amendment to the United States Constitution guarantee an accused the right to be informed of " 'the nature and cause of the accusation.' " *State v. George,* 69 Wis.2d 92, 97, 230 N.W.2d 253 (1975). Stated another way, "[p]rocedural due process requires that a defendant have notice of a specific charge and a chance to be heard in trial of the issues raised by that charge." *Geitner v. State,* 59 Wis.2d 128, 133–34, 207 N.W.2d 837 (1973). The purpose of the information is to inform the defendant of the charges against him. *Whitaker v. State,* 83 Wis.2d 368, 373, 265 N.W.2d 575 (1978). "Notice to the accused, not perfection in draftsmanship, is the key." *State v. Waste Management of Wisconsin, Inc.,* 81 Wis.2d 555, 566, 261 N.W.2d 147 (1978). The test for gauging the adequacy of the pleadings in light of the defendant's right to notice and opportunity to defend was set forth in *State v. George, supra,* quoting *Holesome v. State,* 40 Wis.2d 95, 102, 161 N.W.2d 283 (1968), as follows:

" '. . . In order to determine the sufficiency of the charge, two factors are considered. They are, whether the accusation is such that the defendant [sic] determine whether it states an offense to which he is able to plead and prepare a defense and whether conviction or acquittal is a bar to another prosecution for the same offense.' "

The defendants, in essence, argue that the failure of the relevant counts in the information to recite that they took the property by "threatening the imminent use of force" or to refer to sec. 943.32(1)(b), Stats., when combined with the trial court's jury instruction permitting a conviction if only threat of force was found allowed the jury to return a guilty verdict on a crime not charged in the information and therefore not defended against. Given our holding that sec. 943.32(1) defines one crime of robbery which may be committed with either use of force or threat to use force, we must determine whether the failure to either recite "threatening the imminent use of force" or to refer to sec. 943.32(1)(b) in the information presents a constitutional impediment to the defendants' convictions. We find *United States ex rel. Harris v. State of Illinois,* 457 F.2d 191 (7th Cir. 1972) to be instructive on this issue.

In *Harris,* the indictment against the defendant in part charged him with armed robbery in that he ". . . *by use of force* and while armed with a dangerous weapon, took One Hundred Fifty Dollars in United States currency from the person and presence of John Doyle." The statutes under which the defendant was prosecuted (Ill. Rev. Stats. ch. 38 §§18–1, 18–2) defined armed robbery similar to the definition set forth in sec. 943.32(1) and (2), Stats. 1977, as the taking of property while armed with a dangerous weapon " 'by the use of force *or* by threatening the imminent use of force.' " According to the court, the proof at trial showed that no *actual force* was utilized during the course of the robbery. The de-

fendant was convicted on the crime charged in the indictment and on appeal to the circuit court of appeals claimed that the variance between the indictment and proof at trial deprived him of his Sixth Amendment right " 'to be informed of the nature and cause of the accusation.' " The court rejected the defendant's claim, stating:

"The only constitutional requisites of an indictment are that it 1) charge all of the essential facts of a criminal offense, 2) inform the defendant of the offense charged with sufficient clarity so that he will not be misled while preparing his defense, and 3) protect the defendant against another prosecution for the same offense. [citations omitted]. The sufficiency of the indictment is to be determined by practical rather than technical considerations. [citations omitted].

"Following this rationale, it has been held that the true inquiry that must be made when a criminal defendant contends that there has been a variance between indictment and proof is whether there has been such a variance as to affect the substantial rights of the accused; if the above-mentioned tests of an indictment have been met, a slight variance is deemed nonprejudicial and not a constitutional impairment to a finding of guilt. [citations omitted].

"In the instant case, petitioner was advised by the indictment of the nature of the charges against him so as to enable him to prepare his defense; and had he been acquitted, he could have pleaded the judgment in bar of any further prosecution for the same offense. We thus cannot deem the minor variance between the indictment and proof as a constitutional impairment to petitioner's conviction." *Id.* at 197.

Returning to the case herein, the three counts in the information tried to the jury apprised the defendants that they were being charged with the armed robery of three occupants of the residence at 3300 West Lisbon Avenue. Although the charges only referred to one of the alternative means of establishing the force element of the crime, use of force, it necessarily informed the de-

fendants of the essential element of force in the crime of armed robbery. Moreover, the record establishes that the defendants never claimed they were unable to understand the offenses charged or were unable to prepare a defense at any time during the proceedings in the circuit court, including their initial appearance, the preliminary hearing, the arraignment, the trial, the jury instruction conference, before or after the instructions and motions after trial. Indeed, they entered a plea of not guilty and the record establishes that both defendants had in fact prepared an alibi defense and had complied with the notice requirements of sec. 971.23 (8), Stats., with regard to such defense.

Since the information fully advised the defendants that force was an element of the crime and the defendants were able to intelligently and knowingly enter pleas and prepare defenses to the pertinent accusations, they thus were sufficiently informed of the charges against them. Further, it is obvious that a conviction or acquittal on any one of the three counts would be a bar to further prosecution for the same offense. *See: Manson, supra,* at 428 (". . . multiple punishment would not be appropriate when force and threat of force occur in a single taking"). We therefore conclude that under the tests set forth in *George, supra,* and *Harris, supra,* the variance between the information and the armed robbery jury instructions posed no constitutional impediment to the defendants' convictions.

*By the Court.*—The judgments of the circuit court are affirmed.

SHIRLEY S. ABRAHAMSON, J. (*dissenting*). The trial court found that the police officer had probable cause to arrest Cheers for armed robbery. The record does not support this finding and therefore I dissent.

The error in this case appears to be the prosecutor's not the police officer's.

At Cheers' suppression hearing the arresting officer testified that he had a description of the "age, height, weight and complexion" of the robber later identified as Cheers. The officer was not asked and did not state the age, height, and weight of the described suspect. The officer further testified that the description related to the 9th Street robbers; that Cheers matched the description of one of the robbers; and that the officer therefore arrested Cheers. Apparent from the arresting officer's testimony is that he had no first-hand information as to the description of the robber and that he relied on information acquired from others. But the record does not reveal from whom the arresting officer obtained the description of the 9th Street robbers upon which he relied. Nor does the record indicate whether anyone within the police department had reliable knowledge or information from any source from which the description of the 9th Street robbers the arresting officer used might have been compiled, or what information as to the age, height, weight and complexion of the robber the police department had provided of the 9th Street robbery to the arresting officer prior to the arrest.

On review the majority of this court, in accordance with *Schaffer v. State,* 75 Wis.2d 673, 677–78, 250 N.W. 2d 326 (1977), examines the entire record including the preliminary examination, two suppression hearings and the trial in an attempt to show that the police department had a reliable description of Cheers which the arresting officer used in making the arrest. I conclude that the record is devoid of the necessary links of evidence which, if they existed, the prosecutor could easily have produced to support the arresting officer's testimony.

I agree with the majority's statement of the rules applicable to decide the validity of a warrantless arrest.

The test for probable cause in a case of a warrantless arrest is whether on the basis of the information which impelled the arresting officer to act a warrant could have been procured for the defendant's arrest. *State v. Paszek,* 50 Wis.2d 619, 627, 184 N.W.2d 836, 841 (1971). First, the majority correctly states that whereas in this case the officer does not have first-hand information, the arrest is valid if the facts constituting probable cause exist within the police department. *Johnson v. State,* 75 Wis.2d 344, 348–50, 249 N.W.2d 593 (1977). We explained this rule in *Schaffer v. State,* 75 Wis.2d 673, 676–77, 250 N.W.2d 326 (1977) as follows:

". . . An arresting officer may rely on all collective information in the police department, and, acting in good faith on the basis of such information, may assume at the time of apprehension that probable cause has been established. *State v. Mabra,* 61 Wis.2d 613, 625, 213 N.W.2d 545, 551 (1974); *State v. Taylor,* 60 Wis.2d 506, 515, 210 N.W.2d 873, 878 (1973). . . .

"Such legal justification, however, cannot alone constitute probable cause for such an arrest, for it is necessary that the officer's underlying assumption of probable cause be correct. *State v. Taylor, supra* at 515–16, 210 N.W.2d at 878. Where an officer relies upon a police communication in making an arrest, in the absence of his personal knowledge of probable cause, the arrest will only be based on probable cause, and thus valid, when such facts exist within the police department. *Desjarlais v. State,* 73 Wis.2d 480, 491, 243 N.W.2d 453, 459 (1976); *State v. Shears,* 68 Wis.2d 217, 253, 229 N.W.2d 103, 121 (1975); *State v. Mabra, supra* at 625, 213 N.W.2d at 551; *State v. Taylor, supra* at 515–16, 210 N.W.2d at 878. . . ."

Second, as the majority observes, the collective information of the police department, like all other hearsay information used to show probable cause, must satisfy the two-pronged test for assessing the trustworthiness of such hearsay set forth in *Aguilar v. Texas,* 378 U.S. 108

(1964). *Aguilar* requires that the officer establish (1) the underlying circumstances from which he concludes that the informant is reliable; and (2) that the underlying circumstances or manner in which the informant obtained his information is reliable.

Finally, as the majority correctly states, the prosecutor bears the burden of showing that the *Schaffer* and *Aguilar* standards are met. "Where a violation of the fourth amendment right against an unreasonable search and seizure is asserted, the burden of proof upon the motion to suppress is upon the state." *State v. Taylor,* 60 Wis.2d 506, 519, 210 N.W.2d 873, 880 (1973). "When an arrest is made without a warrant, the burden is on the state to show the existence of probable cause." *Leroux v. State,* 58 Wis.2d 671, 682, 207 N.W.2d 589, 596 (1973).

Both the arresting officer, and Officer Rodgers, one of the officers who had participated in the investigation of the two robberies, testified at various hearings during the course of these proceedings. The prosecution could easily have satisfied the *Schaffer* and *Aguilar* tests by having the officers testify that the police department had a description of the suspect at the time of the arrest and by having the officers set forth the specific description on which the arresting officer relied, the manner in which the information was transmitted to the arresting officer, and the sources from which the police department had received the description.

Officer Rodgers testified at the Cheers' suppression hearing and at the trial. He was not asked to state what description of the robbers he or the police department had received. His testimony was not concerned with events prior to arrest. His testimony related to the identifications made by the victims after the arrest. Thus his testimony is inadequate to furnish the required information.

The arresting officer, testifying on direct examination at the Cheers' suppression hearing, stated that he had a description of the 9th Street robber which served as the basis for his arrest of Cheers:

"*Q.* Had you received information concerning the method of operation of those robberies, what was taken in those robberies and the description of the possible suspects in those robberies? *A.* Yes, I had.
"...
"*Q.* Did you see anyone approach the residence? *A.* Yes. I did.
"*Q.* What happened after you saw that person [Cheers] approach the residence? *A.* I observed that the subject that approached the residence from the alley matched the description of one of the hold-up suspects from the robbery at 3250 North 9th Street on the 15th of December.
"...
"*Q.* In what particular way did Mr. Cheers fit the description of one of the suspects in the robberies? *A.* The age, height, weight and the complexion of Mr. Cheers."

The arresting officer did not state the specific age, height or weight of the suspect whose description he said he had. Nor did he state from whom he had received the description of the possible suspect.

On cross-examination the arresting officer testified as to Cheers' complexion, as follows:

"*Q.* What complexion attitude did he fit of what was publicized to you on December 15th? *A.* Well, that he was medium complected and that he had a bumpy face."

The officer never described what he meant by "bumpy face," and no other testimony even suggests what this term means. The majority, without explanation, construes this description to mean pockmarked.

Noticeably missing from the record is any testimony by the victims of the 9th Street robbery of the descriptions of the robbers they gave the police. In fact the victims

of the 9th Street robbery never testified that they had given descriptions of the robbers to the police. Only the victims of the West Lisbon Avenue robbery testified that they had given descriptions of the robbers to the police.

At trial the arresting officer said he had received basic information in his duties as police officer about the West Lisbon Avenue robbery, including the descriptions of possible suspects of that robbery. The arresting officer did not, however, state on the record that he had received the descriptions of the West Lisbon Avenue robbery at roll call or from a fellow police officer. Nor did the arresting officer state what the descriptions of the West Lisbon Avenue suspects were or that he based Cheers' arrest on the descriptions of the suspects of the West Lisbon Avenue robbery.

The arresting officer's failure to state that he relied on the description of the West Lisbon Avenue robber to arrest Cheers makes no difference in view of the testimony of the victims of the West Lisbon Avenue robbery. The West Lisbon Avenue victims' testimony as to the descriptions they gave the police is not sufficient to form the basis for any valid identification or arrest. Netterville, a victim of the West Lisbon Avenue robbery who was not able to identify Cheers at the line-up or at trial, said at the preliminary examination that she gave the police the following description:

"I described one as being sort of tall. He had on an old saggy hat on his head, gold and the other two, they was about, oh, about five/two and they were black."

She also said that she told the police the weight of the robbers. She did not however say what estimate of weight she had given the police. She also testified that she told the police that one of the robbers was wearing glasses. At trial she testified that the tall black man

with the hat and glasses was Crockett. Thus her description of Cheers, as far as the record shows, is that he was about five/two, black and weighed an undisclosed amount.

Lornell Reid, a victim of the West Lisbon Avenue robbery, testified at the preliminary examination as to the description of the robber (later identified as Cheers) that he gave the police as follows:

"*Q.* How did you describe the first man into the house [Cheers] to the police department? What was he wearing? *A.* Well, he was wearing—he was wearing a heavy coat. I didn't really get quite the color of the coat, but he had on a flop cap.

"*Q.* Was he wearing glasses? *A.* No."

At trial Lornell Reid said that Cheers was wearing a long coat and flop cap, and Lornell Reid also testified as follows as to the description of Cheers' height which he gave to the police:

"*Q.* And how tall did you say he was to the police department? *A.* Well, I don't know whether I gave a definite size that he were, but I said he was somewhere between five feet some, I don't know. I can't quite recall the other what I said, because I wasn't really paying too much attention to his height."

Thus Lornell Reid's total description of Cheers which he gave the police is that Cheers was perhaps "five feet some" and that he wore a long coat and flop cap. He was unable to describe the coat. Apparently he only got a look at Cheers' head and face, but he did not testify as to any description he gave to the police of Cheers' head and face.

David Reid, also present at the West Lisbon Avenue robbery, testified at the preliminary examination as to the description he gave the police. He testified as follows:

"*Q.* Did you give a description of any of the men to the police? *A.* I did.

"*Q.* What did you tell them? *A.* I told them how they appeared to look.

"*Q.* I'm sorry? *A.* I told them what they looked like short time that I got to look at them."

At trial David Reid described Cheers' clothing, saying he "had on a brown looking coat and some sort of dark looking cap, kind of flopped down cap." This testimony is David Reid's entire testimony as to Cheers' description.

Thus, the total description possessed by the police department which appears on the record in this case was that the robber later identified as Cheers was a black man who on the day of the West Lisbon Street robbery wore a long coat and floppy cap, was perhaps five feet some or five/two tall, and weighed an undisclosed amount. The victims' descriptions are "so general that [they fit] a very large group of ordinary young men." *State v. Lee,* 97 Wis.2d 679, 685, 294 N.W.2d 547 (Ct. App. 1980). The record shows that Cheers is black; his age, height, weight or complexion are not a matter of record.

The arresting officer testified that he relied on a description of the robber's age, height, weight and complexion to identify Cheers and as the basis for the arrest, yet the record reveals that the victims gave the police very vague descriptions which did not contain all the information which the arresting officer claimed to have. No victim testified that he or she described Cheers to the police as having a bumpy face or as being a particular age. Neither the victims nor the police officers set forth in the record the robber's described or actual age, height or weight. Absent such a description, the trial judge could not determine whether Cheers matched the description the arresting office said he had.

Not only was the description insufficient to serve as the basis for identifying Cheers, it was also apparently insufficient to immunize from arrest any of the four

black males found at the Fond du Lac Avenue address. All four black men, in addition to Cheers and Crockett, were arrested and presented to the victims of the robberies in a line-up on the morning following the arrest. The men not identified by the victims were released.

If Cheers and the other four men were arrested only for investigatory purposes as these circumstances suggest, the arrest was illegal. As the United States Supreme Court said in *Brown v. Illinois*, 422 U.S. 590, 605 (1975): "The impropriety of the arrest was obvious; awareness of that fact was virtually conceded by the two detectives when they repeatedly acknowledged in their testimony that the purpose of their action was for investigation or for questioning." *See also United States v. Crews*, 445 U.S. 463 (1980). The arresting officer's own testimony indicates that he did not rely on the description of any robbery suspect in arresting Cheers. The arresting officer testified that he arrested Cheers for carrying a $3\frac{1}{2}''$ folded pocket knife which the officer characterized as a concealed weapon. The officer testified that he never advised Cheers that the arrest was for armed robbery.

The majority's assessment of probable cause avoids focus on these problems and instead emphasizes the totality of all the facts and circumstances available to the police at the time of arrest. I agree that the totality of circumstances is important. Of course, to sustain a showing of probable cause each circumstance must, when examined independently, be sufficiently reliable to contribute to the weight of the evidence in support of a finding of probable cause.

The majority views the fact that Cheers was at the house where Crockett was thought to be as a significant factor. The arresting officer had a warrant for Crockett's arrest that listed his address as 3336 N. 3rd Street,

but he testified that he was told at roll call and by a squad officer that Crockett might be at the Fond du Lac Avenue address. The record does not indicate where the police department got this information. Again the prosecutor did not produce evidence as to the basis for the arresting officer's belief that Crockett was at the Fond du Lac Avenue address. Without that evidence I have no way of determining if the information the arresting officer relied on as to Crockett's whereabouts satisfied the tests for probable cause. Apparently recognizing this weakness, the majority attempts to shore up the record by saying that the officer saw Crockett in the kitchen of the Fond du Lac Avenue house before he arrested Cheers. But Crockett and Linda Metcalf (who was present in the house) testified at Crockett's suppression hearing that Crockett was not in the kitchen when the arresting officer was at the door and that the arresting officer might not have been able to see into the kitchen from where he was standing. The trial court, having ruled that the arresting officer had been given consent to enter the house, made no finding as to whether the arresting officer saw Crockett in the kitchen before he arrested Cheers. This factual dispute as to whether the arresting officer knew Crockett was in the house cannot be resolved at the appellate level. *Wurtz v. Fleischman*, 97 Wis.2d 100, 108, 293 N.W.2d 155 (1980).

Even if the state had proven that the arresting officer was justified in his belief that Crockett was at the Fond du Lac address, Cheers' conduct of walking away from the officers and toward the house, of knocking on the door, and of putting his hand in his pocket are not acts sufficient to establish probable cause to arrest Cheers for a robbery that Crockett is suspected of having committed. As the United States Supreme Court said in *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979),

"Where the standard is probable cause, a search or seizure of a person must be supported by probable cause particularized with respect to that person. This requirement cannot be undercut or avoided by simply pointing to the fact that coincidentally there exists probable cause to search or seize another or to search the premises where the person may happen to be."

*See also Pritz v. Hacket,* 440 F. Supp. 592 (W.D. Wis. 1977).

The majority quotes *Sibron v. New York,* 392 U.S. 40, 66–67 (1968), as authority for the proposition that Cheers' acts were proper factors to be considered in establishing probable cause for the arrest. The *Sibron* court said that "deliberately furtive actions and flight at the approach of strangers or law officers are strong indicia of mens rea, and *when coupled with specific knowledge on the part of the officer relating the suspect to the evidence of crime,* they are proper factors to be considered in the decision to make an arrest." (Emphasis added.) Regardless of whether Cheers' actions were "furtive," or "flight," or "threatening," the police in this case lacked "specific knowledge . . . relating" Cheers "to the evidence of crime." If the requirement of specific knowledge is omitted, furtive or threatening action or flight will, as the majority does here, bootstrap such conduct to the level of probable cause in any case in which such conduct was said to have occurred. The characterization which these terms call for may be attached by the observer despite other explanations for the conduct. In this case Cheers was approached by several officers armed with shotguns and his conduct may be explained by these circumstances as well as his knowing his guilt of a crime. Accordingly on the basis of this record the state has not satisfied the *Sibron* test.

I conclude that the prosecutor failed to produce sufficient evidence to sustain the finding of the trial court

that the arresting officer had probable cause to arrest Cheers. *State v. Taylor, supra,* 60 Wis.2d at 520; *State v. Mordeszewski,* 68 Wis.2d 649, 656, 229 N.W.2d 642, 646 (1975).

The illegality of the arrest deprived the trial court of jurisdiction over the person of the defendant. The trial court's jurisdiction is dependent on a lawful arrest or on the defendant's voluntary appearance or on the defendant's waiving the challenge of the legality of the arrest. Cheers did not voluntarily appear, and he carefully preserved his objection to the arrest by making special appearances to contest the illegal arrest and by objecting to the arrest and the court's jurisdiction at various stages of the proceedings. If an arrest is illegal, the trial court has no jurisdiction over the person of the defendant. *La Follette v. Raskin,* 30 Wis.2d 39, 137 N.W.2d 667 (1966); *Laasch v. State,* 84 Wis.2d 587, 590, 267 N.W. 2d 278 (1978). In *Walberg v. State,* 73 Wis.2d 448, 458, 243 N.W.2d 190, 195 (1976), we said:

"This court, . . . while holding that the illegality of an arrest does not affect the trial court's subject matter jurisdiction, has held that personal jurisdiction is dependent upon the defendant's physical presence before the court pursuant to a properly issued warrant, a lawful arrest or a voluntary appearance."

The state urges the court to abandon this position to which this court has adhered for many years. The majority has not acceded to the state's request.

Since I conclude that the record does not support the legality of the arrest, I would remand the case to the trial court to hold a supplementary evidentiary inquiry and to determine the validity of the arrest. *United States v. Morris,* 440 F.2d 224 (D.C. Cir. 1970); *United States v. Seay,* 432 F.2d 395 (5th Cir. 1970).

For the reasons set forth, I dissent.